In the

# United States Court of Appeals

## For the Second Circuit

_____

August Term 2017

Nos. 15-974 (L), 17-2126 (Con)

ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC., OPEN SOCIETY INSTITUTE, PATHFINDER INTERNATIONAL INC., GLOBAL HEALTH COUNCIL, and INTERACTION,

*Plaintiffs-Appellees,*

v.

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARK GREEN, *in his official capacity as Administrator of the United States Agency for International Development*, ROBERT R. REDFIELD, *in his official capacity as Director of the United States Centers for Disease Control and Prevention, and his successors*, ALEX M. AZAR II, *in his official capacity as Secretary of the United States Department of Health and Human Services, and his successors*, UNITED STATES CENTERS FOR DISEASE CONTROL AND PREVENTION, and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

*Defendants-Appellants.**

_____

Appeal from the United States District Court
for the Southern District of New York
No. 05 Civ. 8209 (VM), Victor Marrero, District Judge, Presiding.
(Argued:  May 17, 2018; Decided:  December 20, 2018)

_____

* The Clerk of Court is respectfully directed to amend the official caption as listed above.

Before: STRAUB, POOLER, and PARKER, *Circuit Judges.*

Plaintiffs are several domestic organizations that receive government funds to assist their efforts to fight HIV/AIDS abroad, often through legally distinct affiliates. The funds come with the condition that "[n]o funds . . . be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f). The Supreme Court concluded that this requirement compels speech in violation of the First Amendment. *Agency for Int'l Dev. v. Alliance for Open Soc. Int'l, Inc.*, 570 U.S. 205 (2013). After the Supreme Court's decision, when the Government continued to apply this requirement to plaintiffs' foreign affiliates, plaintiffs sought permanent injunctive relief. The United States District Court for the Southern District of New York (Marrero, *J.*) granted a permanent injunction. We affirm.

Judge Straub dissents in a separate opinion.

**AFFIRMED**.

<div style="margin-left:40%">

Benjamin H. Torrance, David S. Jones, *for* Geoffrey S. Berman, U.S. Attorney's Office, S.D.N.Y., New York, N.Y., *for appellants United States Agency for International Development, Mark Green (Administrator of USAID, in his official capacity), United States Centers for Disease Control and Prevention, Robert R. Redfield (Director, U.S.C.D.C., in his official capacity), United States Department of Health and Human Services, Alex M. Azar II, (Acting Secretary, U.S.H.H.S., in his official capacity).*

David W. Bowker, Catherine M.A. Carroll, Ari J. Savitsky, David A. Stoopler, Kevin M. Lamb, Jason D. Hirsch, Jonathan E. Barbee, Wilmer Cutler Pickering Hale and Dorr

</div>

LLP, Washington, D.C. and New York, N.Y., *for appellees Alliance for Open Society International, Inc., Open Society Institute, Pathfinder International, Global Health Council, InterAction*.

BARRINGTON D. PARKER, *Circuit Judge*:

In *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205 (2013) ("*AOSI*"), the Supreme Court held that a provision of the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (the "Leadership Act"), 22 U.S.C. § 7601 *et seq.*, which required that recipients of funds appropriated under the Act affirmatively adopt a policy explicitly opposing prostitution and sex trafficking violated the First Amendment. The Court determined that this condition, known as the Policy Requirement, could not be applied to plaintiffs because, as Chief Justice Roberts stated, it "compels as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program." *AOSI*, 570 U.S. at 221.

The Government subsequently interpreted the Supreme Court's opinion as allowing the Policy Requirement to continue to be applied to foreign affiliates. Plaintiffs disagreed and sought and obtained a permanent injunction in the

District Court, which concluded that *AOSI* did not allow the Policy Requirement to be applied to plaintiffs' foreign affiliates. The Government appeals and we are required to determine the narrow issue of whether the Government's reading of the Supreme Court's decision is correct. We agree with the District Court that the Government's reading is foreclosed by that opinion and, consequently, we affirm the order below.

## BACKGROUND

The background of this litigation is well known and fully described in the various judicial decisions that have been issued: the Honorable Victor Marrero's thorough and well reasoned decision in 2006, our 2011 opinion affirming him, and the Supreme Court's 2013 opinion affirming us. *See Alliance for Open Soc'y Int'l v. U.S. Agency for Int'l Dev.*, 430 F. Supp. 2d 222 (S.D.N.Y. 2006); *Alliance for Open Soc. Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218 (2d Cir. 2011); *AOSI*, 570 U.S. 205 (2013). We recount here only the background necessary for understanding this appeal.

In 2003, Congress passed the Leadership Act, which authorized the appropriation of billions of dollars to nongovernmental organizations to assist the worldwide fight against HIV/AIDS and other diseases. The Leadership Act

contains the Policy Requirement, which states that "[n]o funds . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f).

Plaintiffs are several domestic organizations that fight HIV/AIDS abroad. Many plaintiffs carry out their aid work through legally distinct affiliates that together constitute global families of closely aligned entities. For example, plaintiff InterAction is a network of U.S.-based humanitarian organizations and contains, as a member, the domestic entity Save the Children Federation, Inc., which is a part of the global set of entities operating as Save the Children, an international aid organization that focuses on children's health. Save the Children Federation, Inc., in turn, is part of the Save the Children Association, a non-profit Swiss association that owns the Save the Children logo and maintains criteria for Save the Children members. There are over 30 distinct Save the Children entities incorporated around the world in addition to in the United States, such as in Australia, Brazil, Canada, India, Japan, Norway, South Africa, Spain, and Swaziland. These entities comprise Save the Children, and share the same name, logo, brand, and mission, even though they are distinct legal entities incorporated in various jurisdictions worldwide.

As plaintiffs explain and the record reflects, maintaining a unified global identity, branding, and approach enhances the ability of an organization like Save the Children to perform its aid mission. Moreover, various legal and administrative considerations encourage (and sometimes require) such international aid organizations to operate as formally legally distinct entities, despite otherwise being unified. As an example, the president and chief executive officer of plaintiff Pathfinder International attested that defendant United States Agency for International Development ("USAID") gives preference for Leadership Act contracts to NGOs that are incorporated outside the United States and sought to increase direct partnerships with local organizations in order to enhance the long-term effectiveness of aid delivery. USAID also limits a significant number of potential grants to organizations incorporated outside of the United States. Moreover, some foreign governments require NGOs to be incorporated in their countries in order to be permitted to undertake public health work there. Overall, factors such as these have caused international aid organizations to be organized as formally legally distinct entities while operating with a unified and consistent identity, mission, and work. As a consequence, these organizations appear to the public as unified entities. Throughout this

litigation, plaintiffs have emphasized that, while they do not support prostitution, they would not include in their mission statements a policy officially expressing an opposition to prostitution because, among other things, effectively fighting diseases like HIV/AIDS often requires direct involvement with sex-worker communities.

In 2005, plaintiffs sued to enjoin the Government's implementation of the Policy Requirement. As noted, the District Court issued a preliminary injunction, which we affirmed on appeal.[1] The Supreme Court granted certiorari and also affirmed, holding that "[t]he Policy Requirement compels as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program. In so doing, it violates the First Amendment and cannot be sustained." *AOSI*, 570 U.S. at 221.

After the Supreme Court's decision, the Government nevertheless continued to apply the Policy Requirement to plaintiffs' foreign affiliates. In January 2015, after receiving letter briefing, the District Court converted its preliminary injunction to a permanent injunction barring the Government from imposing the Policy Requirement on plaintiffs or their affiliates. The Government

[1] Judge Straub dissented in 2011 on the basis that the Policy Requirement did not violate the First Amendment, a position that the Supreme Court subsequently rejected squarely. *See* 651 F.3d at 240.

appealed, and we stayed the permanent injunction pending this appeal.

**STANDARD OF REVIEW**

A district court's decision to issue a permanent injunction is reviewed for abuse of discretion, as "[t]he decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also, e.g., Knox v. Salinas*, 193 F.3d 123, 128-29 (2d Cir. 1999) (per curiam). A district court commits an abuse of discretion when it "(1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions." *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 627 (2d Cir. 2018) (internal quotation marks omitted). We review questions of law *de novo. See ACORN v. United States*, 618 F.3d 125, 133 (2d Cir. 2010).

**DISCUSSION**

**I.**

The narrow issue before this Court is whether applying the Policy Requirement to plaintiffs' closely aligned foreign affiliates violates plaintiffs' own First Amendment rights. The Supreme Court's decision considered this question

and resolved it in plaintiffs' favor. Consequently, we conclude that the District Court did not abuse its discretion in issuing its permanent injunction.[2]

In *AOSI*, the Supreme Court explained that requiring the recipient of government funds to adopt the Government's view on the issue of prostitution and sex trafficking was a violation of plaintiffs' First Amendment rights. 570 U.S. at 219. The Court's opinion focused on the distinction "between conditions that define the federal program and those that reach outside it," *id.* at 217, and the Court explicitly considered the role that affiliates of a funded organization can play in that dichotomy, *id.* at 219. It noted that where a funded organization's speech was limited by a federal program, the funded organization could employ affiliates *outside* the federal program to exercise its First Amendment rights. *Id.* In so reasoning, the Court explicitly recognized that organizations exercise their

---

[2] A plaintiff seeking a permanent injunction against government action taken pursuant to a statutory or regulatory scheme must demonstrate an entitlement to such equitable relief by showing (1) irreparable injury and (2) actual success on the merits. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542, 546 n.12 (1987); *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011). As an equitable remedy, a permanent injunction also requires a showing that remedies at law will inadequately compensate for the injury, that an equitable remedy is warranted in light of the balance of hardships between the plaintiff and defendant, and that the injunction would not disserve the public interest. *eBay*, 547 U.S. at 391; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A constitutional violation, or an allegation of a constitutional violation, satisfies the irreparable injury requirement. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996); *see also Ognibene*, 671 F.3d at 182.

First Amendment rights through their affiliates. *Id.*

The Court therefore made clear that forcing an entity's affiliate to speak the Government's message unconstitutionally impairs that entity's own ability to speak. As Chief Justice Roberts noted, where, as here, an affiliate is "clearly identified" with the recipient of government funds, the recipient can express beliefs that contradict the speech of its affiliate "only at the price of evident hypocrisy." *Id.*[3] Applying the Court's holding in *AOSI* to the present iteration of this case as we must, we hold that the speech of a recipient who rejects the Government's message is unconstitutionally restricted when it has an affiliate

---

[3] It was immaterial to the Supreme Court that an affiliate may be foreign-incorporated. The AOSI opinion speaks only of the harm to plaintiffs due to their affiliation, not about the nature of the affiliated entity. The Supreme Court was keenly aware of the foreign nature of plaintiffs' work and of their partnerships and affiliations with foreign-incorporated organizations. This awareness was on full display at oral argument, where the Government argued that there would be no hypocrisy between a plaintiff and an affiliate because the entities would be required to be sufficiently separate. Justice Ginsburg, for example, apparently rejected this premise, noting that this case differed from those in which forming a separate subsidiary to abide by a funding condition was "a simple matter of corporate reorganization" that cured any constitutional problems with the funding condition. Transcript of Oral Argument at 18. She stated that "getting an NGO . . . recognized in dozens of foreign countries is no simple thing to accomplish" and using a foreign affiliate to speak the Government's message and collect federal funds is "differen[t] in this international setting." *Id.*; J. App. 1787. Justice Kennedy explicitly concurred with Justice Ginsburg's statements regarding foreign NGOs. Transcript of Oral Argument at 26 ("I have the same concerns that Justice Ginsburg expressed about the difficulty of simply creating structures in—in foreign countries.").

who is forced to speak the Government's contrasting message.[4]

These principles decide this appeal. Here, the affiliates are clearly identified with plaintiffs, and to require the affiliates to abide by the Policy Requirement would require the closely related—and often indistinguishable—plaintiffs to be seen as simultaneously asserting two conflicting messages. This is the "evident hypocrisy" to which the Chief Justice referred: when the Government requires contrasting, hypocritical messages between domestic and foreign affiliates by making one speak the Government's message, this requirement infringes the speech of the domestic affiliate and, in so doing, violates the First Amendment. *Id.* Indeed, the Government itself acknowledges that forced hypocrisy can impair an entity's ability to speak: "It may be true that when two organizations are closely linked, in some circumstances the speech of one can be seen as the speech of both." *See* Gov't

---

[4] The dissent attempts to characterize this case as one involving freedom of association. This approach misunderstands both the nature of the right at issue and the Supreme Court's decision. The right that plaintiffs seek to vindicate is the right to free speech: to be able to speak freely without being either compelled to speak or allowed to speak only "at the price of evident hypocrisy." *AOSI*, 570 U.S. at 219. The Court made clear that it conceived of the issue as one involving freedom of speech, stating several times that its animating concerns were the ability of the funding recipient "to *express its beliefs.*" *Id.* (emphasis added). Contrary to the assertions made in the dissent, the cases involving freedom of association are not particularly helpful.

Reply at 9.

The Government's arguments in this appeal are unpersuasive. It mainly contends that foreign organizations like plaintiffs' affiliates do not possess First Amendment rights. But the Government as well as our dissenting colleague misunderstands the Supreme Court's decision in *AOSI*. It is the First Amendment rights of the *domestic plaintiffs* that are violated when the Policy Requirement compels them to "choose between forced speech and paying 'the price of evident hypocrisy.'" *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 106 F. Supp. 3d 355, 361 (S.D.N.Y. 2015) (quoting *AOSI*, 570 U.S. at 219).

The Government also contends that the contrasting speech between domestic and foreign affiliates is irrelevant because, following the Supreme Court's decision, the Policy Requirement may no longer be applied to domestic organizations, and so domestic organizations may now say what they want and still receive government funds. But this argument also misses the point. It is the domestic organization's speech, not its funding, that is at stake when its affiliate is forced to speak the Government's message. If the Government is right, then Chief Justice Roberts was wrong. We part ways with our dissenting colleague because we believe that it is the Supreme Court's decision and not the

Government's brief that controls this appeal.

The Government finally argues that our decisions in *Planned Parenthood Federation of America, Inc. v. Agency for International Development*, 915 F.2d 59 (2d Cir. 1990) and *Center for Reproductive Law & Policy v. Bush*, 304 F.3d 183 (2d Cir. 2002), which upheld a funding condition requiring foreign organizations to agree not to promote abortion, require us to vacate the injunction. These cases, however, are of little help to the Government. In *Center for Reproductive Law & Policy*, we identified the "thrust of the claim" as that because of the government's funding conditions, "foreign NGOs are chilled from interacting and communicating with domestic abortion rights groups such as plaintiff CRLP, thus depriving plaintiffs of the rights to freedom of speech and association in carrying out the mission of the organization." *Center for Reprod. Law & Policy*, 304 F.3d at 188. The foreign NGOs at issue were mere potential partners of the plaintiffs; they were not affiliated. In contrast, here the foreign NGOs and plaintiffs are not just affiliates—they are homogenous. Plaintiffs share their names, logos, and brands with their foreign affiliates, and together they present a unified front. This sameness *creates* the risk of evident hypocrisy that motivated the Supreme Court to find a First Amendment violation. *AOSI,* 570 U.S. at 219.

With the Supreme Court's articulation of "evident hypocrisy" as our lodestar, *Center for Reproductive Law & Policy* did not address the role of closely affiliated foreign NGOs and cannot decide today's result.

Nor can *Planned Parenthood.* In that case, the government refused to fund foreign NGOs who offered abortion as a family-planning technique. We weighed allegations "that it is impractical for United States citizens or organizations to engage in abortion-related activities abroad without the cooperation of foreign organizations and that the Standard Clause deters many of the most logical and effective foreign partners." *Id.* at 64 (internal quotation marks omitted). But critically, the government did not request that foreign NGOs explicitly adopt a policy of not advocating for abortion. As such, the domestic NGOs and partner foreign NGOs were not compelled to make contradictory statements regarding their core objectives as plaintiffs and their foreign affiliates are in this case.

The policies in these cases did not compel speech, did not involve closely identified organizations, and, unlike this case, did not burden the free speech rights of domestic organizations. *Planned Parenthood*, 915 F.2d at 64. We therefore hold that the District Court did not abuse its discretion in enjoining the Government from imposing the Policy Requirement on plaintiffs' closely aligned

foreign affiliates.

**II.**

The Government also argues that the District Court violated Federal Rule of Civil Procedure 65 by imposing the permanent injunction on the basis of letter briefing and in the absence of a formal motion and a full hearing. The Government also argues that the injunction is unclear because its reference to plaintiffs "or their domestic and foreign affiliates" is imprecise. We see no abuse of discretion.

There is no requirement that a District Court must wait for a formal motion and hold a hearing to issue a permanent injunction. This conclusion is, in our view, particularly sound in a case such as this, involving nearly a decade of litigation, multiple appeals and resolution by the Supreme Court. In any event, Rule 65 requires hearings for only preliminary injunctions, not permanent injunctions. *Beck v. Levering*, 947 F.2d 639, 641-42 (2d Cir. 1991) (per curiam) ("Appellants contend that [Rule 65] requires that an evidentiary hearing be held in order to issue a permanent injunction. However, Rule 65 requires hearings for preliminary injunctions, not permanent injunctions.").

Nor does the injunction violate Rule 65(d)'s requirement that an injunction "describe in reasonable detail . . . the act or acts restrained or required." Fed. R.

Civ. P. 65(d)(1)(C). We are confident that the term "affiliate" is sufficiently clear so that the Government will be able "to ascertain from the four corners of the order precisely what acts are forbidden." *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985) (internal quotation marks omitted). As the District Court correctly noted, the word "affiliate" has a sufficiently clear meaning. It is defined, according to that Court, as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." 258 F. Supp. 3d 391, 396 (S.D.N.Y. 2017) (quoting Black's Law Dictionary (10th ed. 2014)). As previously noted, there is an unusually full record in this case. We do not think that the Government, in applying a definition such as this, lacks adequate guidance in determining the entities to which the injunction applies or that the District Court otherwise abused its discretion in fashioning the permanent injunction as it did.

## CONCLUSION

For the foregoing reasons, the order of the District Court is **AFFIRMED.**

STRAUB, Circuit Judge, dissenting:

Today, a majority panel of this Court requires the United States to fund the activities of foreign organizations, which have no constitutional rights, despite their refusal to comply with our government's funding condition. There is no support for such a startling holding. The majority misreads the Supreme Court's 2013 decision in this case, which only held that the First Amendment protects *United States-based* organizations from being required to adopt a particular policy position as a condition of federal funding and to conform their privately-funded activities to that position. The majority decision extends the Supreme Court's holding to an unspecified group of "clearly identified" foreign "affiliates," or "co-branded" foreign partner organizations—an issue that was not before the Supreme Court, and a result that is clearly foreclosed by two of this Court's precedential decisions, *Center for Reproductive Law & Policy v. Bush*, 304 F.3d 183 (2d Cir. 2002), and *Planned Parenthood Federation of America v. United States Agency for International Development*, 915 F.2d 59 (2d Cir. 1990), which held that the Government's foreign policy interest in choosing which foreign organizations it wishes to fund outweighs any incidental impact on domestic organizations' ability to associate with foreign organizations. The majority decision overrules those cases without even the benefit of *en banc* review and effectively extends First Amendment rights to foreign organizations operating outside of the United States by treating "clearly identified"

1

domestic and foreign organizations as a single entity for First Amendment purposes. Although the majority asserts that its decision is narrow because it only applies to "clearly identified" foreign organizations, nothing in our constitutional jurisprudence allows foreign organizations to avoid the Government's funding restrictions by closely associating with domestic organizations and nothing in the majority's decision limits the scope of foreign organizations that may gain First Amendment protection by forming associations with United States-based entities going forward. Indeed, the majority further expands the applicable class of foreign organizations to those which are "closely aligned"—whatever that might mean. Accordingly, I respectfully dissent.

## Background

### I. Procedural History

#### A. 2005–2013: United States Organizations Challenge Policy Requirement

A close reading of the procedural history of this case clarifies that the Supreme Court never had any reason to consider whether 22 U.S.C. § 7631(f) (the "Policy Requirement") is constitutional as applied to Plaintiffs' foreign affiliates or any other foreign organization. At several points during this litigation, Plaintiffs made clear that they did *not* dispute that the Policy Requirement could be constitutionally applied to any foreign organization, including their foreign partners or affiliates. Rather, they *only* challenged the Policy Requirement's direct application to United

2

States-based organizations, and they took great pains to distinguish this Court's binding case law upholding similar funding requirements for the foreign partners of United States-based organizations. Only in 2014, after the Supreme Court had ruled in this case, did Plaintiffs begin to assert that their foreign affiliates must also be exempted from the Policy Requirement. This is a clear departure from their position during earlier stages of this litigation, and this assertion significantly broadens the scope of their First Amendment challenge to the Policy Requirement. As discussed below, this result, which effectively exports First Amendment free speech rights to foreign organizations, was not contemplated by the Supreme Court in 2013 or by any of the prior decisions in this litigation.

The United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 ("Leadership Act"), 22 U.S.C. § 7601 *et seq.*, authorized appropriations to fund worldwide efforts to combat HIV/AIDs, tuberculosis, and malaria. Among other objectives, the Act "make[s] the reduction of HIV/AIDS behavioral risks a priority of all prevention efforts." 22 U.S.C. § 7611(a)(12); *see also* § 7601(15) ("Successful strategies to stem the spread of the HIV/AIDS pandemic will require . . . measures to address the social and behavioral causes of the problem . . . .").[1] The Act identifies "[t]he sex industry, the trafficking of individuals into such industry, and sexual violence" as "additional causes of and factors in the spread of the

---

[1] All references to the U.S. Code are to Title 22, unless otherwise indicated.

3

HIV/AIDS epidemic" and declares that "[p]rostitution and other sexual victimization are degrading to women and children and it should be the policy of the United States to eradicate such practices." § 7601(23). The Leadership Act authorizes funding to combat HIV/AIDS, § 7631, but imposes two restrictions on such funding. First: "No funds . . . may be used to promote or advocate the legalization or practice of prostitution or sex trafficking." § 7631(e). Second:

> No funds . . . may be used to provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking, except that this subsection shall not apply to the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International AIDS Vaccine Initiative or to any United Nations agency.

§ 7631(f). Only the second condition—the "Policy Requirement"—is at issue.

In 2004, the Government began requiring foreign organizations that applied for Leadership Act funding to comply with § 7631(f) by adopting an affirmative anti-prostitution policy. *See* U.S. Agency for Int'l Dev. ("USAID"), Acquisition & Assistance Policy Directive ("AAPD") 04–04 (Revised) (Feb. 26, 2004); *see also All. for Open Soc'y Int'l v. U.S. Agency for Int'l Dev.*, 430 F. Supp. 2d 222, 234 (S.D.N.Y. 2006).[2] Notably, Plaintiffs did not challenge the Government's application of the Policy Requirement to their foreign affiliates, partners, or sub-

---

[2] Those foreign organizations included the Soros Foundations in Tajikistan and Kyrgyzstan, which implemented a Leadership Act-funded project in Central Asia in partnership with the U.S.-based Alliance for Open Society International, one of the Plaintiffs in this litigation. *See All. for Open Soc'y Int'l*, 430 F. Supp. 2d at 235–36.

grantees. *All. for Open Soc'y Int'l*, 430 F. Supp. 2d at 235–36. Instead, they initiated this lawsuit in September 2005, shortly after the Government began requiring United States-based organizations to comply with the Policy Requirement. *See id.* at 237; *see also* USAID, AAPD 05–04 (June 9, 2005). And throughout this litigation, until 2014, Plaintiffs explicitly limited the relief they sought to United States-based organizations.

In 2006, when the District Court granted Plaintiffs' motion for a preliminary injunction, it distinguished our cases regarding funding restrictions to foreign nongovernmental organizations ("NGOs"). *All. for Open Soc'y Int'l*, 430 F. Supp. 2d at 267. Specifically, the District Court stated:

> In the instant case, as Plaintiffs have pointed out, the restrictions at issue apply to NGOs based in the United States, restrictions which extend to these NGOs' speech within [the] United States (for example, a conference on sexual rights and sexual health that AOSI will co-sponsor in this country in June of 2006). Defendants simply have not made an adequate showing as to why such domestic, private speech activity should be necessarily classified as a matter of American foreign policy.

*Id.* The District Court ordered the parties to submit a proposed injunction. *Id.* at 278. In June 2006, the District Court entered the preliminary injunction. In addition to prohibiting the Government from enforcing the Policy Requirement against Plaintiffs Alliance for Open Society International ("AOSI") and Pathfinder International, the injunction proposed by the parties and entered by the District Court included a paragraph that exempted Plaintiffs' *United States-based* "sub-recipients,

5

sub-grantees and sub-contractors" (referred to collectively as "sub-organizations").

This paragraph did not exempt *foreign* sub-organizations, and the injunction makes

no reference to foreign organizations.

In August 2006, the Government appealed the preliminary injunction. In

2007, we remanded for the District Court to consider whether new federal guidelines

provided an adequate constitutional safeguard for domestic organizations bound by

the Policy Requirement. *All. for Open Soc'y Int'l v. U.S. Agency for Int'l Dev.*, 254

F. App'x 843 (2d Cir. 2007) (summary order). These guidelines—the Government's

"Affiliate Guidelines"—were intended to provide an alternative channel for the

Plaintiffs and other United States-based organizations to express their First

Amendment-protected views regarding prostitution but have instead been the source

of a great deal of unnecessary confusion in this case. The Affiliate Guidelines stated

as follows:

> [T]he Government's organizational partners that have adopted a policy
> opposing prostitution and sex-trafficking may, consistent with the
> policy requirement, maintain an affiliation with separate organizations
> that do not have such a policy, provided that such affiliations do not
> threaten the integrity of the Government's programs and its message
> opposing prostitution and sex trafficking, as specified in this guidance.
> To maintain program integrity, adequate separation as outlined in this
> guidance is required between an affiliate which expresses views on
> prostitution and sex trafficking contrary to the government's message
> and any federally-funded partner organization.

Dep't of Health and Human Servs. ("HHS"), Guidance Regarding Section 301(f) of

the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of

6

2003, 72 Fed. Reg. 41,076 (July 23, 2007); *see also* USAID, AAPD 05–04 Amend. 1 (July 23, 2007).  Simply put: the Affiliate Guidelines provided a way for domestic entities to abide by the Policy Requirement while using affiliates to express their contrary views on prostitution.

Plaintiffs' 2008 declarations argued that the Affiliate Guidelines did not provide an adequate alternative channel for communicating their own viewpoints on prostitution, in large part because of the degree of legal separation that the Guidelines required between an organization receiving Leadership Act funding and an affiliate organization expressing views on prostitution that deviated from the Policy Requirement.  The 2008 declarations also discussed the legal and practical difficulties of establishing affiliates in foreign countries, implying that they did *not* currently have any affiliates operating in those countries.  In particular, declarations from the presidents of Cooperative for Assistance and Relief Everywhere ("CARE") and Pathfinder International described how the United States-based organizations operated directly in several foreign countries through "registered branch offices" or "field offices," and did not mention the existence of any legally separate affiliate organizations operating in those countries.[3]

---

[3] The 2008 Gayle declaration described CARE as a member of CARE International, "a federation of 12 other CARE nonprofit members incorporated separately in Australia, Austria, Belgium, Canada, Denmark, France, Germany, Japan, the Netherlands, Norway, Thailand, and the United Kingdom."  However, the declaration only discussed the

7

On remand, Plaintiffs moved to add Interaction and Global Health Council ("GHC") to the lawsuit. These are umbrella organizations for public health NGOs, and GHC includes foreign members. However, Plaintiffs explicitly limited the relief sought to Interaction's and GHC's *United States-based* members. And Plaintiffs' motion to extend the preliminary injunction to Interaction and GHC again exempted only United States-based sub-grantee organizations from the Policy Requirement.

In 2008, the District Court reaffirmed its 2006 preliminary injunction and extended that injunction to Interaction and GHC. *All. for Open Soc'y Int'l v. U.S. Agency for Int'l Dev.*, 570 F. Supp. 2d 533 (S.D.N.Y. 2008). The District Court reasoned that the Affiliate Guidelines did not cure the First Amendment violation, namely, the requirement that the United States-based Plaintiffs adopt an anti-prostitution policy and conform their privately-funded activities to this policy in order to receive Leadership Act funding. *Id.* at 545–50. When discussing the question of standing, the District Court focused exclusively on GHC's United States-based members. *Id.* at 538, 540, 541–42.

In 2011, this Court upheld the District Court's preliminary injunctions. *All. for Open Soc'y Int'l v. U.S. Agency for Int'l Dev.*, 651 F.3d 218 (2d Cir. 2011), *en*

---

Government's application of the Policy Requirement to CARE itself and did not further mention CARE International or its foreign members.

*banc reh'g denied*, 678 F.3d 127 (2d Cir. 2012). In doing so, the instant majority explicitly distinguished the Government's restrictions on funding to foreign NGOs:

> The Agencies' reliance on *DKT Memorial Fund Ltd. v. Agency for International Development*, 887 F.2d 275 (D.C. Cir. 1989), is misplaced, as that case centered around a restriction on the First Amendment activities of *foreign* NGOs receiving U.S. government funds. The challenge here is to the impact of the Policy Requirement on *domestic* NGOs. Indeed, the Agencies have applied the Policy Requirement to foreign organizations since its inception, without challenge. This litigation arose only after the government reversed course and began also applying the Requirement to U.S.-based organizations like AOSI and Pathfinder. The Policy Requirement compels domestic NGOs to adopt a policy statement on a particular issue, and prohibits them from engaging in certain expression at, for example, conferences and forums throughout the United States. These factors convince us that the speech is far more of a domestic than a foreign concern.

*Id.* at 238–39. The Court agreed with the District Court that the Affiliate Guidelines could not cure the First Amendment violation of requiring United States-based organizations to affirmatively adopt an anti-prostitution policy. *Id.* at 239.

Before the Supreme Court, Plaintiffs made it clear that they raised only an "as-applied" challenge to the constitutionality of the Policy Requirement. Brief for Respondents at 42 n.11, *U.S. Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205 (2013) (No. 12–10), 2013 WL 1247770; Transcript of Oral Argument at 36, *U.S. Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205 (2013) (No. 12–10). The parties and the Supreme Court Justices briefly discussed the difficulty of establishing affiliate organizations that would comply with the laws of the foreign

9

countries in which they operated—a discussion that was relevant to the burden imposed by the Affiliate Guidelines and which suggested that Plaintiffs operated directly in those foreign countries and did not have any existing foreign affiliates. Brief for Respondents at 52–56, *U.S. Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205 (2013) (No. 12–10), 2013 WL 1247770; Transcript of Oral Argument at 18–19, 27, *U.S. Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205 (2013) (No. 12–10).

In 2013, the Supreme Court held that the Policy Requirement violated the First Amendment rights of United States-based NGOs by conditioning funding on adoption of the Government's point of view in a way that could not be cabined to the Leadership Act-funded programs but would also affect the organizations' privately-funded activities. *U.S. Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 213–21 (2013). The Supreme Court concluded that while affiliates can provide an adequate safeguard in other contexts, such as where a funding restriction prohibits an organization from using the specified funds for a particular First Amendment-protected activity, "[a]ffiliates cannot serve that purpose when the condition is that a funding recipient espouse a specific belief as its own." *Id.* at 219. The Supreme Court characterized Plaintiffs as "a group of domestic organizations engaged in combating HIV/AIDS overseas." *Id.* at 210.

Not a single reference was made to the Government's ability to impose the Policy Requirement on foreign organizations in the Supreme Court's decision itself, in the parties' briefs, or at oral argument. Tellingly, the Supreme Court made no mention of our decisions in *Center for Reproductive Law & Policy ("CRLP")* and *Planned Parenthood* because at issue before it was the Policy Requirement's application to domestic organizations and not foreign partner organizations, as in those two cases.

### B. 2014–2017 District Court Proceedings: Plaintiffs Challenge Government's Application of the Policy Requirement to Their Foreign "Affiliates"

As discussed above, from 2004 until 2014, the Plaintiffs never challenged the Government's requirement that all foreign organizations which applied for Leadership Act funds or received Leadership Act sub-grants from domestic organizations adopt an anti-prostitution policy. In this vein, in September 2014, the Government issued funding notices that explicitly exempted all United States-based organizations from the Policy Requirement but continued to apply the Policy Requirement to foreign organizations. *See* HHS Guidance, 79 Fed. Reg. 55,367 (Sept. 16, 2014); USAID, AAPD 14–04, at 9–10 (Sept. 12, 2014). In October 2014, for the first time, Plaintiffs began to argue that the Supreme Court's 2013 decision required the Government to exempt their "foreign affiliates" from the Policy Requirement. Notably, the foreign affiliate organizations described in Plaintiffs'

11

October 2014 declarations were not mentioned at all in Plaintiffs' 2008 declarations, or at any other point during the eight years of litigation that led to the Supreme Court's 2013 decision.[4]

In its pre-motion responses and at an October 2014 pre-motion conference, the Government strongly contested this position, pointing to this Court's decision in *Planned Parenthood* and arguing that the Supreme Court had not considered the Policy Requirement's application to foreign organizations in its 2013 decision because the Plaintiffs had never challenged that practice. The Government also argued that the District Court should require further submissions, including a formal motion and opposition, before issuing an injunction. Specifically, in its October 30, 2014, submission, the Government stated:

> There are numerous factual and legal issues that have not been addressed at any stage of this litigation that are implicated by [P]laintiffs' pre-motion letters, including . . . the applicability of constitutional rights to foreign organizations even when affiliated with U.S. organizations, the degree of affiliation that exists in fact, and many others. . . . Additionally, the parties must be afforded an opportunity to respond to each other's submissions provided to the Court today.

---

[4] The majority emphasizes an October 2014 declaration from Save the Children's executive vice president and chief operating officer describing that organization's foreign affiliate structure. As noted above, the 2008 declarations stated that Plaintiffs worked directly in foreign countries through local branch offices and did not highlight the role of any foreign affiliates. Save the Children's executive officers did not submit a declaration in this litigation prior to October 2014.

In January 2015, without any further submissions or hearings, the District Court granted a permanent injunction. *All. for Open Soc'y Int'l v. U.S. Agency for Int'l Dev.*, 106 F. Supp. 3d 355 (S.D.N.Y. 2015). The District Court relied solely on the Supreme Court's 2013 decision, reasoning that the Supreme Court's discussion of the Government's Affiliate Guidelines exempted both Plaintiffs and their foreign affiliates from the Policy Requirement. *Id.* at 360–61. The District Court prohibited the Government from enforcing the Policy Requirement against Plaintiffs' foreign affiliates, without defining which foreign organizations qualify as Plaintiffs' affiliates. *Id.* at 360–61, 363–64. Under the terms of the injunction, foreign organizations are eligible to receive grants from the Government or sub-grants from Plaintiffs without adopting an anti-prostitution policy, just as the Plaintiffs themselves need not comply with the Policy Requirement to receive Leadership Act grants from the Government or sub-grants from other organizations. The District Court further directed that, "[i]f the Government intends to apply the Policy Requirement to any organizations whatsoever, then the Government must show cause identifying which categories of organizations and why imposing the requirement would not violate the decisions of this Court and the Supreme Court." *Id.* at 363. The District Court stayed the injunction from January 2015 until June 2017, while the parties engaged in mediation and while it considered the Government's motion for reconsideration and clarification.

13

In 2017, the Government moved for reconsideration of the District Court's 2015 injunction, arguing that the order did not comply with Federal Rule of Civil Procedure 65's requirement that injunctions be clear and definite because the Government could not ascertain which foreign organizations the injunction applied to. Plaintiffs opposed reconsideration. Plaintiffs stated that "[w]hile the injunction as written is sufficiently clear and specific to take immediate effect, Plaintiffs would have no objection to the Court's addition of language explaining that 'clearly identified' foreign affiliates are those that share the same name, trademark, and public branding (*e.g.*, corporate logo) as Plaintiffs . . . ." Plaintiffs provided examples of "clearly identified" foreign affiliates, such as CARE India and Pathfinder India, and contrasted their definition with the Government's Affiliate Guidelines. Finally, Plaintiffs stated that they "stand ready to work with the government to address individual questions and to provide the government lists of their affiliates—as they have done on prior occasions—which would identify foreign affiliates that share Plaintiffs' same name, trademark, and public branding." The Government argued that the Plaintiffs' definition was not sufficient because it did not identify a controlling legal standard and because a shared name, trademark, and public branding alone would not necessarily demonstrate that a foreign organization is so closely tied to a domestic organization that the domestic organization's First Amendment rights would be violated if the Government requires the foreign

14

organization to adopt an anti-prostitution policy in order to receive Leadership Act funding.

In June 2017, the District Court denied reconsideration and lifted its stay of the 2015 order. *All. for Open Soc'y Int'l v. U.S. Agency for Int'l Dev.*, 258 F. Supp. 3d 391 (S.D.N.Y. 2017). Citing the Black's Law Dictionary and Oxford English Dictionary definitions of "affiliate," the District Court concluded that, "[t]he class of non-governmental organizations, or corporations, which share such a relationship with Plaintiffs and are thus affiliates for the purposes of the permanent injunction is almost certainly limited and ascertainable." *Id.* at 396. However, the District Court added the following:

> Insofar as the Government needs any additional guidance in defining "affiliate" or identifying specific entities that would be covered by the definition, Plaintiffs have offered a reasonable suggestion to develop clarifying language. The parties therefore should meet and confer in an effort to propose an agreed-upon response within thirty days of the date of this Order. The parties are directed to submit a report on the status of such discussions at that time.

*Id.* The District Court extended the time for the parties to submit the status report until August 2017. The Government moved to defer the meetings in light of this Court's July 2017 order staying the injunction. Plaintiffs submitted a status report representing that the parties had reached a tentative agreement and reflecting that Plaintiffs wished to continue meeting despite this Court's stay order. In September 2017, the District Court denied the Government's motion to defer the meetings,

15

reasoning that this Court only stayed the injunction insofar as it applied to foreign affiliates; the parties could still agree to a definition of "affiliate" for the purpose of implementing the injunction as to Plaintiffs' domestic affiliates. In October 2017, the parties submitted another status report. The parties agreed that a definition of domestic affiliates was unnecessary because the Government concedes that it may not constitutionally apply the Policy Requirement to *any* United States-based organizations, regardless of affiliation with Plaintiffs. The Government argued that the parties should hold off on any further meetings until this Court concluded its review of the injunction, while Plaintiffs argued that "coming to agreement on the definition of 'affiliate' at this juncture, would facilitate the government's timely implementation of the injunction as to foreign affiliates in the event the court of appeals affirms that aspect of the injunction." This is the last District Court docket entry and it reflects that the District Court and parties have not yet decided exactly which organizations qualify as Plaintiffs' foreign affiliates.

## II.   Proceedings in this Court

The Government timely appealed both the 2015 injunction and the 2017 denial of reconsideration.[5]   In its opening brief, the Government argues that (1) its

---

[5] The Government's appeal of the 2015 injunction was withdrawn and reinstated several times while the parties engaged in mediation. In March 2017, this Court reinstated the appeal, but held it in abeyance pending the District Court's determination of the motion to reconsider. This Court reactivated the appeal on June 12, 2017.

funding restriction is constitutional as applied to foreign organizations, and thus the District Court erred in extending the injunction to Plaintiffs' foreign affiliates, and (2) the injunction does not "state its terms specifically" or "describe in reasonable detail . . . the act or acts restrained or required" as demanded by Federal Rule of Appellate Procedure 65 because it is unclear which foreign organizations the injunction applies to. In response, the Plaintiffs argue that the Supreme Court's 2013 decision in this case prohibits the Government from applying its funding restriction to Plaintiffs' "clearly identified" foreign affiliates. They attempt to distinguish *CRLP* and *Planned Parenthood*, which upheld a similar funding restriction on foreign organizations, based on Plaintiffs' close association with their foreign affiliates, which they argue will result in "evident hypocrisy" if the foreign affiliates are forced to adopt an anti-prostitution policy. Plaintiffs also argue that the terms of the injunction are clear and specific enough to give the Government notice of what is prohibited.

The Government replies that (1) Plaintiffs mischaracterize the Supreme Court's 2013 decision, which did not address the application of the Policy Requirement to Plaintiffs' foreign affiliates or any other foreign organization, (2) the injunction is not clear enough for the Government to determine which foreign organizations qualify as Plaintiffs' "clearly identified" foreign affiliates, and (3) the District Court should have allowed further briefing before issuing the permanent

17

injunction. In July 2017, another panel of this Court stayed the injunction insofar as it applies to foreign organizations, including Plaintiffs' foreign affiliates.

**Discussion**

We review a district court's grant of a permanent injunction for abuse of discretion. *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016). "A district court abuses its discretion when (1) its decision rests on an error of law or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions. *Id.* (internal quotation marks and ellipsis omitted). We review questions of law *de novo*. *See N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).

An injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)–(C). Rule 65 "reflects Congress' concern with the dangers inherent in the threat of a contempt citation for violation of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds." *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (quoting *Sanders v. Airline Pilots' Ass'n, Int'l*, 473 F.2d 244, 247 (2d Cir. 1972)). Under this standard, the enjoined party must be able to "ascertain from the four corners of the order precisely what acts are forbidden." *Id.*

18

(quoting *Sanders*, 473 F.2d at 247). An injunction violates Rule 65's specificity requirement if a party "would have to resort to extrinsic documents to comply with the order's commands." *Id.*

To obtain a permanent injunction, a party "must succeed on the merits and show 'the absence of an adequate remedy at law and irreparable harm if the relief is not granted.'" *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (quoting *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989)). Injunctions that alter the status quo, and injunctions against government statutes and policies, are typically disfavored. *Cf. N.Y. Civil Liberties Union*, 684 F.3d at 294 (in preliminary injunction context, injunctions that "alter rather than maintain the status quo" require a heightened showing of likelihood of success); *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (in preliminary injunction context, "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.").

## I. Constitutional Issue

Although "freedom of speech prohibits the government from telling people what they must say," *All. for Open Soc'y Int'l*, 570 U.S. at 213, this principle has never before been extended to foreign organizations operating outside the United States that apply for discretionary funding from the United States government.

19

While the Spending Clause empowers Congress to attach restrictions on the funds it provides to private organizations, the Government may not impose funding conditions that infringe domestic organizations' First Amendment rights. *All. for Open Soc'y Int'l*, 570 U.S. at 213–17. This "unconstitutional conditions" doctrine distinguishes between "conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize," which are generally permissible, and "conditions that seek to leverage funding to regulate speech outside the contours of the program itself," which are not. *Id.* at 214–15. In its 2013 decision, the Supreme Court applied this "unconstitutional conditions" doctrine to the Government's requirement that domestic NGOs adopt an anti-prostitution policy to receive Leadership Act funding and concluded that the Policy Requirement compelled Plaintiffs to adopt the Government's position in a way that could not be limited to the Leadership Act-funded programs and was thus unconstitutional. *Id.* at 217–21.

The Government does not dispute that it may no longer apply the Policy Requirement to any domestic organizations. The only remaining question is whether the Government may apply the Policy Requirement to foreign organizations, including but not limited to, Plaintiffs' foreign affiliates. Because the District Court legally erred when it enjoined the Government from requiring foreign organizations

20

that receive Leadership Act funding to adopt an anti-prostitution policy, I would reverse the injunction.

### A. Supreme Court's 2013 Decision

As illustrated by the procedural history detailed above, Plaintiffs' and the District Court's reliance on the Supreme Court's 2013 decision, at this time and in these circumstances, is misplaced. The constitutionality of the Policy Requirement, as applied to any and all foreign organizations, was never contemplated by the Supreme Court, as it was never challenged by the Plaintiffs. The Plaintiffs and District Court misread an excerpt from one paragraph of the Supreme Court's 2013 decision to state that the Government could not constitutionally enforce the Policy Requirement against Plaintiffs' foreign affiliates. The relevant paragraph reads as follows:

> When we have noted the importance of affiliates in this context, it has been because they allow an organization bound by a funding condition to exercise its First Amendment rights outside the scope of the federal program. Affiliates cannot serve that purpose when the condition is that a funding recipient espouse a specific belief as its own. If the affiliate is distinct from the recipient, the arrangement does not afford a means for the *recipient* to express *its* beliefs. If the affiliate is more clearly identified with the recipient, the recipient can express those beliefs only at the price of evident hypocrisy.

*All. for Open Soc'y Int'l*, 570 U.S. at 219 (internal citation omitted). The District Court and Plaintiffs rely solely on the Supreme Court's statement regarding the "evident hypocrisy" of differing policy viewpoints between Plaintiffs and their

21

"clearly identified" affiliates, but they have taken this statement out of context. The full excerpt above illustrates that the Supreme Court did not hold that the "evident hypocrisy" created by affiliates' differing positions violated the First Amendment in itself, but rather that the Affiliate Guidelines failed to provide an adequate alternative channel for Plaintiffs to express their own First Amendment-protected views while complying with the Policy Requirement themselves. *Id.*; *contrast Regan v. Taxation Without Representation*, 461 U.S. 540, 544 (1983) (noting that a domestic organization which was required to refrain from lobbying as a condition of its 501(c)(3) tax-exempt status could form a "dual structure" by establishing a separate 501(c)(4) organization to engage in lobbying activities with independent funding). Because the Plaintiffs and all other United States-based organizations are now exempt from the Policy Requirement, they may express their views on prostitution directly and no longer need to make use of the alternative channel for expression offered by the Government's Affiliate Guidelines.

Plaintiffs also suggest that the Supreme Court's 2013 decision must have applied to foreign organizations as well as domestic organizations because it is a "facial invalidation" of the Policy Requirement. Not so. Plaintiffs repeatedly assured the Supreme Court that they brought only an as-applied challenge. Brief for Respondents at 42 n.11, *U.S. Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205 (2013) (No. 12–10), 2013 WL 1247770; Transcript of Oral Argument at

22

36, *U.S. Agency for Int'l Dev.*, 570 U.S. 205 (2013) (No. 12–10). However, the Supreme Court's decision can best be understood as striking down the Policy Requirement as applied to any domestic organization. It is a facial invalidation in the sense that it applies to *all* United States-based organizations, not only the Plaintiffs. The Government has never contested this point. But the Supreme Court's decision should not be read as striking down the Policy Requirement's application to foreign organizations, both because foreign organizations operating outside the United States have no First Amendment rights and because Plaintiffs made clear throughout the litigation that they did not challenge the Government's Policy Requirement as applied to any foreign organization.

## B. Applicable Case Law

Because the Supreme Court's 2013 decision and the prior decisions in this litigation did not decide whether the Government may require foreign organizations to comply with the Policy Requirement, we must apply controlling case law upholding restrictions on funding to foreign organizations.

It is undisputed that Plaintiffs' foreign affiliates lack First Amendment rights because they are foreign organizations operating outside the United States. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."). The Plaintiffs do not

23

contest this issue.  Instead, Plaintiffs argue that requiring their foreign affiliates to comply with the Policy Requirement violates their own First Amendment rights because the foreign affiliates' positions on prostitution will be mistakenly attributed to Plaintiffs or will contradict Plaintiffs' own positions on prostitution, resulting in "evident hypocrisy."

Because the Plaintiffs may now receive Leadership Act funding without regard to whether they have an affirmative anti-prostitution policy—in other words, the Government is no longer compelling the Plaintiffs to adopt any particular position on prostitution as a condition of Leadership Act funding—the issue in this case is no longer about Plaintiffs' free speech rights.  Instead, the current constitutional question turns on Plaintiffs' right to associate with foreign organizations.  Plaintiffs' argument that their own free speech rights are impacted by their foreign affiliates' compelled speech assumes that Plaintiffs' right to associate with foreign affiliates outweighs Congress's ability to regulate funding to foreign organizations.

The Supreme Court has held that United States citizens' First Amendment right to associate with foreigners (aliens) does not override Congress's plenary power to decide which aliens to admit to the United States and which to exclude. *Kleindienst v. Mandel*, 408 U.S. 753 (1972) (rejecting American scholars' attempt to compel admission of a Belgian Marxist scholar who was invited to an academic

24

conference); *see also Kerry v. Din*, 135 S. Ct. 2128, 2139–41 (2015) (Kennedy, J., concurring) (assuming that U.S. citizen wife had a protected liberty interest in her foreign husband's admission to United States, but upholding the Government's denial of the husband's visa because it was based on a "facially legitimate and bona fide" reason).  It follows that United States-based organizations' First Amendment right to associate with foreign organizations does not outweigh the Government's power to conduct foreign affairs by deciding which, if any, foreign organizations it wishes to fund.

We have previously rejected United States-based organizations' First Amendment challenges to a funding restriction that applied only to foreign organizations.  *Ctr. for Reprod. Law & Pol'y v. Bush*, 304 F.3d 183 (2d Cir. 2002); *Planned Parenthood Fed'n of America v. U.S. Agency for Int'l Dev.*, 915 F.2d 59 (2d Cir. 1990).[6]  These cases challenged the Government's enforcement of a restriction on foreign funding known as the Mexico City Policy.[7]  Under this policy,

---

[6] As noted above, this Court distinguished the Government's enforcement of restrictions on domestic organizations from cases involving foreign organizations in its 2011 decision in this litigation.  *All. for Open Soc'y Int'l*, 651 F.3d at 238–39.

[7] The Mexico City Policy originated with President Reagan in 1984.  *See Ctr. for Reprod. Law & Pol'y*, 304 F.3d at 187.  The policy was rescinded by Presidents Clinton and Obama and reinstated by Presidents George W. Bush and Trump.  *See id.* at 188; Memorandum, The Mexico City Policy, 82 Fed. Reg. 8495 (Jan. 25, 2017).  Human Rights Watch estimated that the Mexico City Policy has affected approximately $8.8 billion in U.S. funding for global health efforts, including funds disbursed for HIV/AIDS prevention.  *See* Human Rights Watch, *Trump's 'Mexico City Policy' Or 'Global Gag Rule': Questions & Answers* (Feb. 14, 2018, 12:55 AM), https://www.hrw.org/news/2018/02/14/trumps-mexico-city-policy-or-global-gag-rule.

the Government prohibited grants to foreign NGOs that carried out any activities related to abortion, including privately-funded speech and activities. *Planned Parenthood*, 915 F.2d at 61–62.[8] Planned Parenthood argued that the restriction on funding to foreign organizations violated its First Amendment associational rights by "pick[ing] off or buy[ing] up" potential partner organizations for abortion-related activities and requiring Planned Parenthood to spend more of its own private funds on such activities. *Id.* at 63. This Court rejected the First Amendment claim, reasoning that any harm to Planned Parenthood was incidental to the Government's otherwise-nonjusticiable foreign policy decision and that "[s]uch an incidental effect from the refusal to subsidize the exercise of a constitutional right obviously is not what the Supreme Court considers 'an obstacle in the path' of plaintiffs seeking to exercise the right." *Id.* at 64.[9] We explained that:

> Were the courts to allow challenges to foreign aid programs on the ground that the government's subsidy of a particular viewpoint abroad encourages the foreign recipients of American aid not to speak or associate with Americans opposed to that viewpoint, the political branches would find it impossible to conduct foreign policy.

---

[8] Domestic NGOs that receive Government funding for family planning may carry out privately-funded abortion-related activities and pro-abortion advocacy so long as the organizations maintain adequate physical and financial separation between federally-funded and abortion-related projects. *See Rust v. Sullivan*, 500 U.S. 173 (1991) (rejecting domestic NGOs' First Amendment and other challenges to this funding restriction).

[9] In a case involving the same restriction, the D.C. Circuit expressed skepticism of the plaintiffs' argument, but ultimately dismissed a First Amendment right to associate claim on ripeness grounds. *DKT Memorial Fund Ltd. v. U.S. Agency for Int'l Dev.*, 887 F.2d 275, 291–98 (D.C. Cir. 1989).

*Id.* at 64.  In 2002, we reaffirmed this decision.  *Ctr. for Reprod. Law & Pol'y*, 304 F.3d at 190–91.  The Center for Reproductive Law & Policy ("CRLP") argued that "collaboration [with foreign organizations] is essential to their ability to carry out their mission as advocates of reproductive rights," and listed several ways in which the organization's decreased ability to partner with foreign organizations (because of the funding restriction) hindered its mission.  304 F.3d at 189–90.  We concluded that the case was indistinguishable from *Planned Parenthood*, which remained binding given the lack of intervening Supreme Court authority, and also rejected CRLP's due process and equal protection challenges to the funding restriction.  *Id.* at 190–91, 195–98.

Plaintiffs argue that *Planned Parenthood* and *CRLP* are distinguishable because the Policy Requirement compels speech, whereas the Mexico City Policy only restricted speech.  However, because the compelled speech and unconstitutional conditions doctrines have only been applied in the context of restrictions on funding to domestic organizations and United States-based organizations are no longer bound by the Policy Requirement (remember, foreign organizations operating outside the United States have no First Amendment rights), this distinction does not change the outcome.  Further, although it is true that the Mexico City Policy does not require foreign organizations to affirmatively state an opposition to abortion, the policy does not distinguish between United States-funded and privately-funded

27

activities and has been interpreted broadly: to receive USAID funding, a foreign NGO must certify that it "will not, while receiving assistance under the grant, perform or actively promote abortion as a method of family planning in AID-recipient countries or provide funding to other foreign nongovernmental organizations that conduct such activities." *Ctr. for Reprod. Law & Pol'y*, 304 F.3d at 189 (internal quotation marks omitted). Plaintiffs also argue that *Planned Parenthood* and *CRLP* did not involve "co-branded, clearly identified affiliates that share a common identity with U.S. organizations." But while our prior decisions did not turn on the identity of the foreign partner organizations, the Mexico City Policy applies to *all* United States funding to foreign organizations, regardless of whether the foreign organization applying for funding is "co-branded" or "clearly identified" with a United States-based organization.[10] Indeed, Plaintiffs' case is weaker than Planned Parenthood's or CRLP's because Plaintiffs are not alleging that they have actually lost any or all of their foreign affiliates or partners, but rather that their foreign affiliates' anti-prostitution policies (which the affiliates need only adopt if

---

[10] For example, Save the Children reportedly complies with the Mexico City Policy. *See* Benjamin Kentish, *Sweden Vows To Stop Giving Aid To Any Organisations That Follow Donald Trump's Anti-Abortion Rule*, The Independent (July 12, 2017, 4:27 PM), https://www.independent.co.uk/news/world/europe/sweden-donald-trump-anti-abortion-rule-foreign-aide-ban-mexico-policy-organisations-pro-life-a7837591.html (stating that Swedish officials identified Save the Children as a group of organizations that had adopted the Mexico City Policy).

they apply for Leadership Act funding) will contradict Plaintiffs' views and result in inconsistent positions or "evident hypocrisy."

It bears repeating that Plaintiffs never challenged the Government's application of the Policy Requirement to their "co-branded" or "clearly identified" foreign affiliates until October 2014. No reference was made to any "co-branded" or "clearly identified" foreign affiliates that actually existed during the earlier stages of this litigation, and the majority's argument to the contrary misreads portions of the record in which the parties and Supreme Court Justices discussed the practical barriers to establishing *purely hypothetical* affiliate organizations that would have served as an alternative channel for the domestic organizations to express their own anti-prostitution views under the Government's Affiliate Guidelines. And although the Government has been requiring all foreign organizations, including Plaintiffs' "clearly identified" foreign affiliates, to comply with the Policy Requirement throughout this litigation,[11] Plaintiffs have only discussed the harm they face in hypothetical terms. They have failed to identify even one specific instance where a foreign affiliate's position on prostitution actually resulted in harm such as lost Leadership Act funding, lost private funding, or even inconsistent messaging (in other words, "evident hypocrisy"). Moreover, any danger of "evident hypocrisy"

---

[11] While the District Court enjoined the Policy Requirement as to Plaintiffs' foreign affiliates in 2015, that injunction has been stayed throughout the litigation.

29

resulting from the foreign and domestic organizations' inconsistent positions on prostitution can be avoided entirely if the Plaintiffs' foreign affiliates use private funding rather than applying for Leadership Act funding. In this situation, the Plaintiffs would remain eligible for Leadership Act funding, but would be unable to sub-grant Leadership Act funds to their foreign affiliates. Alternatively, as the Government suggests, the Plaintiffs and their foreign affiliates may use disclaimers (i.e., stating specifically that their views on prostitution are solely their own and do not reflect their international affiliates' views) to reduce any confusion regarding their differing approaches to prostitution.

The lack of certainty over which foreign organizations qualify as affiliates is cause for further concern. Notably, the District Court and Plaintiffs seem to have ascribed different meanings to the term "affiliate." In its 2017 order denying reconsideration, the District Court referred to the following definitions: (1) "a corporation that is related to another corporation by shareholding or other means of control; a subsidiary, parent, or sibling corporation," (quoting Black's Law Dictionary 69 (10th ed. 2014)); and (2) "a person or organization officially attached to a larger body," (quoting Oxford English Dictionary). *All. for Open Soc'y Int'l*, 258 F. Supp. 3d at 396. The Plaintiffs, however, suggest that *any* foreign partner organization that shares one of the Plaintiffs' "name, branding, and logo" and "operates within a common corporate framework toward a common mission" would

30

be covered by the injunction, regardless of whether the organization is "related . . . by shareholding or other means of control," so as to satisfy the Black's Law Dictionary definition of an affiliate. The District Court ordered the parties to meet and propose a joint definition of "affiliate," or a list of covered foreign affiliates, to help the Government identify which foreign entities are covered by the injunction. But the parties have not yet agreed on a definition. Thus, it is unclear whether the injunction can be enforced against the Government (for example, through contempt proceedings) absent further agreement from the parties regarding which foreign organizations the injunction applies to.

I recognize that Plaintiffs have a practical interest in maintaining policy positions that are consistent with their foreign partners, especially where the United States-based and foreign organizations use the same name, signs, and logos, and attempt to "speak with one voice." Requiring Plaintiffs' foreign affiliates to adopt an anti-prostitution policy if they apply for Leadership Act grants or receive sub-grants from Plaintiffs may result in inconsistent messaging between Plaintiffs and their foreign affiliates, or require Plaintiffs to either go back to operating directly in foreign countries (re-opening the branch offices they referred to in their 2008 declarations) or to seek out new foreign partner organizations for Leadership Act projects. If anything, this dilemma raises a constitutional question of whether domestic organizations have a First Amendment right to associate so closely with

foreign organizations and whether that associative right outweighs the Government's interest in limiting its funding to foreign organizations. However, this constitutional question was *not* decided by the Supreme Court in 2013 and has never been briefed in this case. Instead, the Plaintiffs and majority seem to assume that a domestic and foreign organization must be treated as *one entity* for First Amendment free speech purposes because the two organizations share the same name, brand, and mission. Neither the Supreme Court, nor any court, has ever held as much. In sum, I am unconvinced that any inconvenience or inconsistent policy positions that may result from the application of the Policy Requirement to Plaintiffs' "clearly identified" or "closely aligned" foreign affiliates amounts to a violation of Plaintiffs' own First Amendment rights, especially because our decisions in *Planned Parenthood* and *CRLP* held that United States-based organizations do not have an unlimited right to collaborate with foreign organizations. Given the lack of intervening Supreme Court authority, we remain bound by *Planned Parenthood* and *CRLP*, and those decisions control the outcome here. *See United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004) ("[W]e are not the first panel to address this issue and are bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court."). I also agree with the Court's decisions in *Planned*

32

*Parenthood* and *CRLP* because any other result would allow United States-based organizations to export their own First Amendment rights to foreign organizations.

For the reasons discussed above, I would reverse the District Court's injunction and hold that the Policy Requirement may constitutionally be applied to any foreign organization, including Plaintiffs' "clearly identified" foreign affiliates.

I respectfully dissent.