(Slip Opinion) OCTOBER TERM, 2019 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AGENCY FOR INTERNATIONAL DEVELOPMENT ET AL. *v.* ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 19–177. Argued May 5, 2020—Decided June 29, 2020

In the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003, as relevant here, Congress limited the funding of American and foreign nongovernmental organizations to those with "a policy explicitly opposing prostitution and sex trafficking." 22 U. S. C. §7631(f). In 2013, that Policy Requirement, as it is known, was held to be an unconstitutional restraint on free speech when applied to American organizations. *Agency for Int'l Development* v. *Alliance for Open Society Int'l, Inc.*, 570 U. S. 205. Those American organizations now challenge the requirement's constitutionality when applied to their legally distinct foreign affiliates. The District Court held that the Government was prohibited from enforcing the requirement against the foreign affiliates, and the Second Circuit affirmed.

*Held*: Because plaintiffs' foreign affiliates possess no First Amendment rights, applying the Policy Requirement to them is not unconstitutional. Two bedrock legal principles lead to this conclusion. As a matter of American constitutional law, foreign citizens outside U. S. territory do not possess rights under the U. S. Constitution. See, *e.g.*, *Boumediene* v. *Bush*, 553 U. S. 723, 770–771. And as a matter of American corporate law, separately incorporated organizations are separate legal units with distinct legal rights and obligations. See, *e.g.*, *Dole Food Co.* v. *Patrickson,* 538 U. S. 468, 474–475. That conclusion corresponds to Congress's historical practice of conditioning funding to foreign organizations, which helps ensure that U. S. foreign aid serves U. S. interests.

Plaintiffs' counterarguments are unpersuasive. First, they claim

that because a foreign affiliate's policy statement may be attributed to them, American organizations themselves possess a First Amendment right against the Policy Requirement's imposition on their foreign affiliates. First Amendment cases involving speech misattribution between formally distinct speakers, see, *e.g.*, *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U. S. 557, 574–575, however, are premised on something missing here: Government compulsion to associate with another entity. Even protecting the free speech rights of only those foreign organizations that are closely identified with American organizations would deviate from the fundamental principle that foreign organizations operating abroad do not possess rights under the U. S. Constitution and enmesh the courts in difficult line-drawing exercises. Second, plaintiffs assert that the Court's 2013 decision encompassed both American organizations and their foreign affiliates. That decision did not facially invalidate the Act's funding condition, suggest that the First Amendment requires the Government to exempt plaintiffs' foreign affiliates or other foreign organizations from the Policy Requirement, or purport to override longstanding constitutional law and corporate law principles. Pp. 3–9.

911 F. 3d 104, reversed.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, and GORSUCH, JJ., joined. THOMAS, J., filed a concurring opinion. BREYER, J., filed a dissenting opinion, in which GINSBURG and SOTOMAYOR, JJ., joined. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 19–177

AGENCY FOR INTERNATIONAL DEVELOPMENT, ET AL., PETITIONERS *v.* ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 29, 2020]

JUSTICE KAVANAUGH delivered the opinion of the Court.

In 2003, Congress passed and President George W. Bush signed the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act, known as the Leadership Act. 117 Stat. 711, as amended, 22 U. S. C. §7601 *et seq.* Aiming to enhance America's response to the ravages of the global HIV/AIDS crisis, the Leadership Act launched "the largest international public health program of its kind ever created." §7601(29). The Act has helped save an estimated 17 million lives, primarily in Africa, and is widely viewed as the most successful American foreign aid program since the Marshall Plan.

To advance the global relief effort, Congress has allocated billions of dollars to American and foreign nongovernmental organizations that combat HIV/AIDS abroad. As relevant here, Congress sought to fund only those organizations that have, or agree to have, a "policy explicitly opposing prostitution and sex trafficking." §7631(f); see also §7631(e); 45 CFR §89.1 (2019). Congress imposed that con-

dition on funding, known as the Policy Requirement, because Congress found that prostitution and sex trafficking "are additional causes of and factors in the spread of the HIV/AIDS epidemic" and that prostitution and sex trafficking "are degrading to women and children." §7601(23).

Plaintiffs are American nongovernmental organizations that receive Leadership Act funds to fight HIV/AIDS abroad. Plaintiffs have long maintained that they do not want to express their agreement with the American commitment to eradicating prostitution. Plaintiffs consider a public stance of neutrality toward prostitution more helpful to their sensitive work in some parts of the world and also to their full participation in the global efforts to prevent HIV/AIDS.

After enactment of the Leadership Act, plaintiffs challenged the Policy Requirement, alleging that it violated the First Amendment. In 2013, this Court agreed, concluding that the Policy Requirement ran afoul of the free speech principle that the Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech." *Agency for Int'l Development* v. *Alliance for Open Society Int'l, Inc.*, 570 U. S. 205, 214 (2013) (internal quotation marks omitted). Therefore, the Policy Requirement no longer applies to *American* organizations that receive Leadership Act funds, meaning that American organizations can obtain Leadership Act funds even if they do not have a policy explicitly opposing prostitution and sex trafficking.

But as has been the case since 2003, *foreign* organizations that receive Leadership Act funds remain subject to the Policy Requirement and still must have a policy explicitly opposing prostitution and sex trafficking. Following this Court's 2013 decision barring the Government from enforcing the Policy Requirement against American organizations, plaintiffs returned to court, invoking the First

Amendment and seeking to bar the Government from enforcing the Policy Requirement against plaintiffs' legally distinct foreign affiliates. The U. S. District Court for the Southern District of New York agreed with plaintiffs and prohibited the Government from enforcing the Policy Requirement against plaintiffs' foreign affiliates. The U. S. Court of Appeals for the Second Circuit affirmed. Judge Straub dissented. He described as "startling" the proposition that the First Amendment could extend to foreign organizations operating abroad. 911 F. 3d 104, 112 (2018). The Second Circuit's decision was stayed pending this Court's review, meaning that foreign organizations currently remain subject to the Policy Requirement.

We granted certiorari, 589 U. S. \_\_\_ (2019), and now reverse the judgment of the Second Circuit. Plaintiffs' position runs headlong into two bedrock principles of American law.

*First*, it is long settled as a matter of American constitutional law that foreign citizens outside U. S. territory do not possess rights under the U. S. Constitution. Plaintiffs do not dispute that fundamental principle. Tr. of Oral Arg. 58–59; see, *e.g.*, *Boumediene* v. *Bush*, 553 U. S. 723, 770–771 (2008); *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 558–559 (2004) (Scalia, J., dissenting); *United States* v. *Verdugo-Urquidez*, 494 U. S. 259, 265–275 (1990); *Johnson* v. *Eisentrager*, 339 U. S. 763, 784 (1950); *United States ex rel. Turner* v. *Williams*, 194 U. S. 279, 292 (1904); U. S. Const., Preamble.

As the Court has recognized, foreign citizens *in the United States* may enjoy certain constitutional rights—to take just one example, the right to due process in a criminal trial. See, *e.g.*, *Verdugo-Urquidez*, 494 U. S., at 270–271; *Plyler* v. *Doe*, 457 U. S. 202, 210–213 (1982); *Kwong Hai Chew* v. *Colding*, 344 U. S. 590, 596 (1953); *Bridges* v. *Wixon*, 326 U. S. 135, 148 (1945); *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369 (1886); cf. *Bluman* v. *Federal Election*

*Comm'n*, 800 F. Supp. 2d 281, 286–289 (DC 2011), aff'd, 565 U. S. 1104 (2012). And so too, the Court has ruled that, under some circumstances, foreign citizens in the U. S. Territories—or in "a territory" under the "indefinite" and "complete and total control" and "within the constant jurisdiction" of the United States—may possess certain constitutional rights. *Boumediene*, 553 U. S., at 755–771. But the Court has not allowed foreign citizens outside the United States or such U. S. territory to assert rights under the U. S. Constitution. If the rule were otherwise, actions by American military, intelligence, and law enforcement personnel against foreign organizations or foreign citizens in foreign countries would be constrained by the foreign citizens' purported rights under the U. S. Constitution. That has never been the law. See *Verdugo-Urquidez*, 494 U. S., at 273–274; *Eisentrager*, 339 U. S., at 784.\* To be sure, Congress may seek to enact laws that afford foreign citizens abroad statutory rights or causes of action against misconduct by U. S. Government officials, or laws that otherwise regulate the conduct of U. S. officials abroad. See *Verdugo-*

——————

*As Justice Jackson stated for the Court in *Eisentrager*:

"If the Fifth Amendment confers its rights on all the world . . . , the same must be true of the companion civil-rights Amendments, for none of them is limited by its express terms, territorially or as to persons. Such a construction would mean that during military occupation irreconcilable enemy elements, guerrilla fighters, and 'werewolves' could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments.

"Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. *Cf. Downes* v. *Bidwell*, 182 U. S. 244. None of the learned commentators on our Constitution has even hinted at it." 339 U. S., at 784–785.

*Urquidez,* 494 U. S., at 275; cf. 10 U. S. C. §§2734(a), 2734a(a); 18 U. S. C. §2340A; 21 U. S. C. §904; 22 U. S. C. §§2669, 2669–1; 42 U. S. C. §2000dd; but see 28 U. S. C. §2680(k) (Federal Tort Claims Act's exception for torts "arising in a foreign country"). Plaintiffs did not raise any such statutory claim in this case.

*Second*, it is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations. See *Dole Food Co.* v. *Patrickson*, 538 U. S. 468, 474–475 (2003); *Cedric Kushner Promotions, Ltd.* v. *King*, 533 U. S. 158, 163 (2001); P. Blumberg, K. Strasser, N. Georgakopoulos, & E. Gouvin, Corporate Groups §§6.01, 6.02, 6.05 (2020 Supp.).

Plaintiffs' foreign affiliates were incorporated in other countries and are legally separate from plaintiffs' American organizations. Even though the foreign organizations have affiliated with the American organizations, the foreign organizations remain legally distinct from the American organizations. Plaintiffs do not ask this Court to pierce the corporate veil, nor do they invoke any other relevant exception to that fundamental corporate law principle. Tr. of Oral Arg. 54.

Those two bedrock principles of American constitutional law and American corporate law together lead to a simple conclusion: As foreign organizations operating abroad, plaintiffs' foreign affiliates possess no rights under the First Amendment.

That conclusion corresponds to historical practice regarding American foreign aid. The United States supplies more foreign aid than any other nation in the world. Cong. Research Serv., Foreign Assistance: An Introduction to U. S. Programs and Policy (2020) (Summary). Acting with the President in the legislative process, Congress sometimes imposes conditions on foreign aid. See 22 U. S. C. §§2271, 2272, 2371, 7110(g)(2). Congress may condition funding on

6    AGENCY FOR INT'L DEVELOPMENT *v.* ALLIANCE FOR
OPEN SOCIETY INT'L, INC.

Opinion of the Court

a foreign organization's ideological commitments—for example, pro-democracy, pro-women's rights, anti-terrorism, pro-religious freedom, anti-sex trafficking, or the like.  Doing so helps ensure that U. S. foreign aid serves U. S. interests.  By contrast, plaintiffs' approach would throw a constitutional wrench into American foreign policy.  In particular, plaintiffs' approach would put Congress in the untenable position of either cutting off certain funding programs altogether, or instead funding foreign organizations that may not align with U. S. values.  We see no constitutional justification for the Federal Judiciary to interfere in that fashion with American foreign policy and American aid to foreign organizations.

In short, plaintiffs' foreign affiliates are foreign organizations, and foreign organizations operating abroad have no First Amendment rights.

To overcome that conclusion, plaintiffs advance two main arguments.  But neither persuades us.

*First*, plaintiffs theorize that the foreign affiliates' required statement of policy against prostitution and sex trafficking may be incorrectly attributed to the American organizations.  Therefore, the theory goes, the American organizations themselves possess a First Amendment right against imposition of the Policy Requirement on their foreign affiliates.

As support, plaintiffs point to First Amendment cases involving speech misattribution between formally distinct speakers.  See, *e.g.*, *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 574–575 (1995); *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.*, 475 U. S. 1, 15 (1986) (plurality opinion); cf. *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 87 (1980). But the constitutional issue in those cases arose because the State forced one speaker to host another speaker's speech.  See *Hurley*, 515 U. S., at 572–573; *Pacific Gas*, 475 U. S., at 15; cf. *PruneYard*, 447 U. S., at 85, 87.  Here, by

contrast, the United States is not forcing plaintiffs to affiliate with foreign organizations. Plaintiffs are free to choose whether to affiliate with foreign organizations and are free to disclaim agreement with the foreign affiliates' required statement of policy. Any alleged misattribution in this case and any effect on the American organizations' message of neutrality toward prostitution stems from their choice to affiliate with foreign organizations, not from U. S. Government compulsion. Because the First Amendment misattribution cases are premised on government compulsion to associate with another entity, those cases do not apply here.

In support of their misattribution argument, plaintiffs also cite *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 544–545, and n. 6 (1983). But as relevant here, that case simply explained that a speech restriction on a corporate entity did not prevent a separate affiliate from speaking, a point that is not disputed in this case.

We appreciate that plaintiffs would prefer to affiliate with foreign organizations that do not oppose prostitution. But Congress required foreign organizations to oppose prostitution in return for American funding. And plaintiffs cannot export their own First Amendment rights to shield foreign organizations from Congress's funding conditions.

Stressing that their position is limited, plaintiffs emphasize that the Court could narrowly decide to protect the free speech rights of only those foreign organizations that are *closely identified* with American organizations—for example, those foreign affiliates that share similar names, logos, and brands with American organizations. According to plaintiffs, those "closely identified" scenarios greatly increase the risk of misattribution. But again, the First Amendment cases involving speech misattribution arose when the State forced one speaker to host another speaker's speech. No compulsion is present here. Moreover, plaintiffs' proposed line-drawing among foreign organizations

would blur a clear rule of American law: Foreign organizations operating abroad do not possess rights under the U. S. Constitution.  Plaintiffs' carve-out not only would deviate from that fundamental principle, but also would enmesh the courts in difficult line-drawing exercises—how closely identified is close enough?—and leave courts without any principled basis for making those judgments.  We discern no good reason to invent a new and legally unmoored exception to longstanding principles of American constitutional and corporate law.

*Second*, plaintiffs argue that the Court's 2013 decision in this case encompassed both plaintiffs' American organizations and their foreign affiliates, meaning that, in plaintiffs' view, the Court has already resolved the issue before us. That is not correct.  The plaintiffs in the 2013 case were these same American organizations.  It is true that the Court considered the possibility that an American organization could work through affiliates to potentially avoid the burdens of the otherwise-unconstitutional application of the Policy Requirement.  But the Court rejected that alternative, which in essence would have compelled the American organizations to affiliate with other organizations.  The Court instead ruled that the Policy Requirement may not be applied to plaintiffs' American organizations.  Therefore, plaintiffs' current affiliations with foreign organizations are their own choice, not the result of any U. S. Government compulsion.

Stated simply, in the prior decision, the Court did not facially invalidate the Act's condition on funding.  The Court did not hold or suggest that the First Amendment requires the Government to exempt plaintiffs' foreign affiliates or other foreign organizations from the Policy Requirement. And the Court did not purport to override the longstanding constitutional law principle that foreign organizations operating abroad do not possess constitutional rights, or the elementary corporate law principle that each corporation is

a separate legal unit.

The dissent emphasizes that this case concerns "the First Amendment rights of American organizations." *Post*, at 1 (opinion of BREYER, J.). We respectfully disagree with that characterization of the question presented. The Court's prior decision recognized the First Amendment rights of American organizations and held that American organizations do not have to comply with the Policy Requirement. This case instead concerns foreign organizations that are voluntarily affiliated with American organizations. Those foreign organizations are legally separate from the American organizations. And because foreign organizations operating abroad do not possess constitutional rights, those foreign organizations do not have a First Amendment right to disregard the Policy Requirement.

In sum, plaintiffs' foreign affiliates are foreign organizations, and foreign organizations operating abroad possess no rights under the U. S. Constitution. We reverse the judgment of the U. S. Court of Appeals for the Second Circuit.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–177

_____

## AGENCY FOR INTERNATIONAL DEVELOPMENT, ET AL., PETITIONERS *v.* ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 29, 2020]

JUSTICE THOMAS, concurring.

I agree with the Court that the Policy Requirement does not violate the First Amendment as applied to respondents' foreign affiliates, and I agree that nothing about this Court's decision in *Agency for Int'l Development* v. *Alliance for Open Society Int'l, Inc.*, 570 U. S. 205 (2013) (*AOSI I*), suggests otherwise. See *ante*, at 8–9. I write separately to note my continued disagreement with *AOSI I* and to explain that the Policy Requirement does not violate the First Amendment for a far simpler reason: It does not compel anyone to say anything.

In *AOSI I*, the Court erred by holding that the Policy Requirement violated respondents' First Amendment rights by conditioning their receipt of Leadership Act* funds on the affirmation of certain program objectives. "The First Amendment does not mandate a viewpoint-neutral government." *AOSI I,* 570 U. S., at 221 (Scalia, J., joined by THOMAS, J., dissenting). Thus, the Government may require those who seek to carry out federally funded programs

_____

*As the Court explains, the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (Leadership Act), 22 U. S. C. §7601 *et seq.*, "allocate[s] billions of dollars to American and foreign nongovernmental organizations that combat HIV/AIDS abroad." *Ante,* at 1.

to support the Government's objectives with regard to those programs. *Ibid.* After all, the Constitution itself "impos[es] affirmative ideological commitments prerequisite to assisting in the government's work." *Id.*, at 227. It excludes viewpoints such as communism and anarchism, stating that those engaged in government work must swear an oath to support our Constitution's republican form of government. See Art. VI, cl. 3.

Moreover, the mere conditioning of funds on "'the affirmation of a belief'" tied to the purpose of a government program involves "no compulsion at all." *AOSI I,* 570 U. S., at 226 (Scalia, J., joined by Thomas, J., dissenting). Such a condition is "the reasonable price of admission to a limited government-spending program that each organization remains free to accept or reject." *Ibid.* Just as respondents are not compelled to associate with their foreign affiliates, see *ante*, at 6–8, they are not compelled to participate in the Leadership Act program.

The Policy Requirement does not violate the First Amendment, regardless of whether it is applied to respondents, respondents' legally distinct foreign affiliates, or any other organization, foreign or domestic. Because the Court properly rejects respondents' attempt to extend our erroneous precedent, I join its opinion in full.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–177

_____

## AGENCY FOR INTERNATIONAL DEVELOPMENT, ET AL., PETITIONERS *v.* ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 29, 2020]

JUSTICE BREYER, with whom JUSTICE GINSBURG and JUSTICE SOTOMAYOR join, dissenting.

The Court, in my view, asks the wrong question and gives the wrong answer. This case is not about the First Amendment rights of foreign organizations. It is about—and has always been about—the First Amendment rights of American organizations.

The last time this case came before us, those American organizations vindicated their constitutional right to speak freely, both at home and abroad. In *Agency for Int'l Development* v. *Alliance for Open Society Int'l, Inc.*, 570 U. S. 205 (2013) (*AOSI I*), we held that the First Amendment forbids the Government from distorting their speech by requiring, as a condition of receiving federal funds, that they "pledge allegiance" to a state-sponsored message. *Id.*, at 220.

This time, the question is whether the American organizations enjoy that same constitutional protection against government-compelled distortion when they speak through clearly identified affiliates that have been incorporated overseas. The answer to that question, as I see it, is yes. I dissent from the Court's contrary conclusion.

I

To understand the issue now before us, one must appreciate how it got here.  Given this litigation's lengthy history, that requires a rather detailed look at why this dispute first arose, what we decided in our prior decision (namely, *AOSI I*), and where the case proceeded from there.

A

As we explained in *AOSI I*, the plaintiffs in this action (respondents in this Court then and now) "are a group of domestic organizations engaged in combating HIV/AIDS overseas."  *Id.*, at 210.  Their lifesaving work spans multiple continents.  *Id.*, at 211.  For example, respondents run "programs aimed at limiting injection drug use in Uzbekistan, Tajikistan, and Kyrgyzstan, preventing mother-to-child HIV transmission in Kenya, and promoting safer sex practices in India."  *Ibid.*  Respondents also counsel high-risk populations such as sex workers, encourage foreign governments to adopt beneficial public policies, and share information about best practices in publications and at conferences.  See *ibid.*; App. 171, 217, 222, 419.  To support these international efforts, respondents must make fundraising appeals to donors worldwide.  See, *e.g.*, *id.*, at 366, 384, 431–433, 457.  But crucially for both their mission and for this case, respondents also "receive billions [of dollars] annually in financial assistance from the United States."  *AOSI I*, 570 U. S., at 210.

One of respondents' primary sources of federal funding is the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003.  117 Stat. 711, as amended, 22 U. S. C. §7601 *et seq.* (Leadership Act).  Congress enacted the Leadership Act with the goal of creating "a 'comprehensive, integrated' strategy to combat HIV/AIDS around the world."  *AOSI I*, 570 U. S., at 209 (quoting §7611(a)).  To that end, the statute allocates considerable federal dollars to nongovernmental organizations fighting

HIV/AIDS abroad. *Id.*, at 209–211.

But Leadership Act funding comes with strings attached. Two, in particular. First, no Leadership Act funds "'may be used to promote or advocate the legalization or practice of prostitution or sex trafficking.'" *Id.*, at 210 (quoting §7631(e)). Second, with some exceptions not relevant here, any recipient of Leadership Act funds must have "'a policy explicitly opposing prostitution and sex trafficking.'" *Id.*, at 210 (quoting §7631(f)). The first condition limiting how Leadership Act funds may be spent has never been challenged in this litigation. *Id.*, at 210. What has driven this decades-long dispute is the second condition, the "Policy Requirement" that requires recipients to espouse a government message. *Ibid.*

Concerned that "adopting a policy explicitly opposing prostitution" could "alienate certain host governments" and "mak[e] it more difficult to work with prostitutes in the fight against HIV/AIDS," respondents sued. *Id.*, at 211. They asserted that the Policy Requirement put an unconstitutional condition on the receipt of federal funds and was thus unenforceable. *Id.*, at 212. Accordingly, as the case came to us in *AOSI I*, the question was whether this funding condition violated respondents' First Amendment rights. *Id.*, at 211.

B

The answer, we held in *AOSI I*, was yes. Our reasoning then demands close inspection now.

To begin, we observed in *AOSI I* that "the Policy Requirement would plainly violate the First Amendment" if it operated "as a direct regulation of speech." *Id.*, at 213. Commanding someone to speak a government message contravenes the "basic First Amendment principle that 'freedom of speech prohibits the government from telling people what they must say.'" *Ibid.* (quoting *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547

U. S. 47, 61 (2006) (*FAIR*)); see also, *e.g.*, *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943); *Wooley* v. *Maynard*, 430 U. S. 705, 717 (1977).

That the Policy Requirement is a funding condition, rather than a direct command, complicated the analysis in *AOSI I* but did not change the outcome. True, Congress' Article I spending power "includes the authority to impose limits on the use of [federal] funds to ensure they are used" as "Congress intends," even conditions that "may affect the recipient's exercise of its First Amendment rights." *AOSI I*, 570 U. S., at 213–214. That is all the first (and unchallenged) Leadership Act condition does by forbidding federal funds from being used to promote prostitution or sex trafficking. See *id.*, at 217–218. Congress may not, however, "leverage funding to regulate speech outside the contours" of the program it has chosen to subsidize. *Id.*, at 214–215. *That*, as we will see, is what the Policy Requirement does— and why we held in *AOSI I* that this second condition violated respondents' First Amendment rights.

The constitutional line is whether a funding condition helps "specify the activities Congress wants to subsidize" or instead seeks to "reach [speech] outside" the federal program. *Id.*, at 214, 217. We recognized in *AOSI I* that this line "is not always self-evident." *Id.*, at 217. To "hel[p] illustrate the distinction," our decision gave two examples from our precedents. *Id.*, at 215.

As an example of what the Government may *not* do, we pointed to our decision *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364 (1984). There, the Government required noncommercial broadcasters receiving federal financial assistance to refrain from editorializing entirely; they could not even "establish [an] 'affiliate' organizatio[n]" to editorialize on their behalf "with nonfederal funds." *Id.*, at 400. By giving a broadcaster no way "to make known its views on matters of public importance," the funding condition in *League of Women Voters* violated the First Amendment.

*Id.*, at 400–401. That condition, as we put it in *AOSI I*, "went beyond" ensuring that federal funds did not subsidize the broadcasters' editorial content and therefore distorted their "speech outside the scope of the program." 570 U. S., at 216.

Just the opposite was true in *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540 (1983), the case we cited in *AOSI I* as an example of what the Government *may* do. In *Regan*, a nonprofit group received tax-exempt status as a §501(c)(3) organization on the condition that the organization not engage in lobbying. *AOSI I,* 570 U. S., at 215 (citing *Regan*, 461 U. S., at 544). Even though this condition on federal financial assistance affected the nonprofit's exercise of First Amendment rights, the condition was constitutional because it "did not prohibit [the nonprofit] from lobbying Congress altogether." 570 U. S., at 215.

Specifically, the nonprofit in *Regan*—unlike the broadcasters in *League of Women Voters*—was permitted to establish an affiliate to carry on its lobbying activities as a §501(c)(4) organization. *AOSI I*, 570 U. S., at 215 (citing *Regan*, 461 U. S., at 544). The nonprofit could thus act (and speak) through two corporate entities: The §501(c)(3) organization could get the tax exemption (but not lobby), while the §501(c)(4) organization could lobby (but not get the tax exemption). 570 U. S., at 215. Since requiring the nonprofit to adopt this "'dual structure'" was not "'unduly burdensome,'" the condition in *Regan* "did not deny the [nonprofit] a government benefit 'on account of its intention to lobby.'" 570 U. S., at 215 (quoting *Regan*, 461 U. S., at 545, and n. 6). The condition was thus constitutional, even though it essentially compelled the nonprofit to affiliate with other organizations. See 570 U. S., at 215.

In *AOSI I*, we held "that the Policy Requirement falls on the unconstitutional side of the line" separating *League of Women Voters* (unconstitutional) and *Regan* (constitutional). 570 U. S., at 217. Like the funding condition in

*League of Women Voters*, we explained, the Policy Requirement affects protected speech outside the scope of the federal program. 570 U. S., at 218. "By requiring recipients to profess a specific belief," it "goes beyond defining" the program "to defining the recipient" in the eyes of their global audience. *Ibid.* Respondents cannot "avow [a] belief dictated by" the Government "when spending Leadership Act funds, and then turn around and assert a contrary belief, or claim neutrality," when acting on their "own time and dime." *Ibid.* The Policy Requirement thus conditioned funding on an across-the-board distortion of respondents' message. See *ibid.*

We further explained in *AOSI I*—and this is critical— why we could not accept the Government's suggestion that the case was just a redux of *Regan*. In *AOSI I*, the Government suggested a similar "dual-structure" solution to the First Amendment problem. Like the nonprofit in *Regan*, the Government noted, respondents could act (and speak) through two corporate entities: One organization could receive Leadership Act funds on respondents' behalf (and comply with the Policy Requirement), while a legally separate affiliate could communicate respondents' preferred message (and not receive Leadership Act funds)—or vice versa. *AOSI I*, 570 U. S., at 219. True enough. But we *rejected* the Government's argument all the same.

Why did we reject it? Because corporate formalities do nothing to ward off speech distortion where—like *AOSI I*, but unlike *Regan*—the Government has required a speaker to "espouse a specific belief as its own." 570 U. S., at 219. "If the affiliate is distinct from the recipient," we reasoned, "the arrangement does not afford a means for the *recipient* to express *its* beliefs." *Ibid.* And if "the affiliate is more clearly identified with the recipient, the recipient can express those beliefs only at the price of evident hypocrisy." *Ibid.* With respect to the latter situation, in other words, compelling a recipient to disavow a message involuntarily

uttered by its clearly identified affiliate is forced hypocrisy, not free speech. See *ibid.*

In sum, the Policy Requirement conditioned federal funds on an unavoidable and irreversible distortion of respondents' protected speech. We therefore held in *AOSI I* that the Policy Requirement "violates the First Amendment and cannot be sustained." *Id.*, at 221.

### C

On remand from our decision, the District Court did what district courts ought to do. It "tailor[ed] 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation'" that we identified in *AOSI I. Hills* v. *Gautreaux*, 425 U. S. 284, 294 (1976) (quoting *Milliken* v. *Bradley*, 418 U. S. 717, 744 (1974)).

The District Court, like our Court, recognized that respondents' work—and with it their protected speech—has a global reach. But respondents, it turns out, use different organizational structures to deliver services in different places. 106 F. Supp. 3d 355, 360–361 (SDNY 2015). Sometimes, particularly when foreign governments (or our own government) require, respondents operate through legally separate affiliates incorporated abroad. *Ibid.*; see also, *e.g.*, App. 368, 373–375.

In the District Court's view, those corporate formalities did not meaningfully change the First Amendment calculus. See 106 F. Supp. 3d, at 360–361. Respondents, together with their affiliates, convey a clear, consistent message to high-risk populations, government officials, healthcare professionals, prospective employees, and private donors across the globe. See, *e.g.*, App. 370–371, 391, 460–461. They share the same name, logo, and branding—all of which use identical colors, fonts, and imagery. See, *e.g.*, *id.*, at 445–455. They adhere to shared values, work towards common goals, and coordinate their collective mes-

sage. See, *e.g.*, *id.*, at 385–386, 404–429. To an outside observer, respondents and their affiliates are a single, cohesive unit. They speak as one.

The District Court consequently concluded that imposing the Policy Requirement on respondents' affiliates—wherever they happen to have been incorporated—would force respondents to "expres[s] contrary positions on the same matter through [their] different organizational components." 106 F. Supp. 3d, at 361. To prevent that from happening, and in keeping with the principles we set forth in *AOSI I*, the District Court enjoined enforcement of the Policy Requirement against respondents and their clearly identified affiliates, including affiliates that were incorporated overseas. *Id.*, at 363. The District Court thought that remedial order necessary to protect respondents' *own* First Amendment rights—rights that, as American organizations, respondents unquestionably have. *Id.*, at 361.

The Court of Appeals understood the District Court's order that way, too. "The narrow issue before" us, the Court of Appeals explained, "is whether applying the Policy Requirement to [respondents'] closely aligned foreign affiliates violates [respondents'] own First Amendment rights." 911 F. 3d 104, 109 (CA2 2018). The Court of Appeals held that the answer was yes and affirmed on that basis. *Ibid.* We granted certiorari to review the Court of Appeals' decision.

II

The road has been long, but we have arrived at the specific question now before us: whether enforcing the Policy Requirement against respondents' clearly identified foreign affiliates violates respondents' own First Amendment rights. Like the District Court and the Court of Appeals, I believe the answer is yes.

Our reasoning in *AOSI I*, along with the body of precedent on which it relied, should decide this case. Just as

compelling a clearly identified *domestic* affiliate to espouse a government message distorts respondents' own protected speech, *AOSI I*, 570 U. S., at 219, so too does compelling a clearly identified *foreign* affiliate to espouse the same government message. Either way, federal funding conditioned on that affirmative avowal of belief comes at an unconstitutionally high "price of evident hypocrisy." *Ibid.*

Properly understood, our speech-misattribution cases— in particular *Hurley* v. *Irish-American Gay*, *Lesbian and Bisexual Group of Boston*, *Inc.*, 515 U. S. 557 (1995)—confirm that common-sense conclusion. Any other result would undermine First Amendment protections for the countless American speakers who address audiences overseas.

A

Respondents should prevail here for the same reasons they prevailed in *AOSI I*. When respondents speak through legally separate but clearly identified affiliates, we held, that speech is attributed to respondents for First Amendment purposes. *AOSI I*, 570 U. S., at 219. So when the Government demands as a condition of federal funding that their clearly identified affiliate "espouse a specific belief as its own," respondents may express a contrary view through some other corporate channel only on pain of appearing hypocritical. *Ibid.* Leveraging Congress' Article I spending power to distort respondents' protected speech in this way therefore violates *respondents'* First Amendment rights— whatever else might be said about the affiliate's own First Amendment rights (or asserted lack thereof). *Ibid.*

These principles apply with full force to the dispute now before us. Respondents and their affiliates receive federal funding to fight HIV/AIDS *overseas*. What has been at stake in this case from the beginning, then, is protected speech often aimed at audiences abroad. Our decision in *AOSI I* shielded respondents' global message from govern-

ment-compelled distortion in the eyes of those foreign audiences, as well as listeners here at home. *Ibid.* Yet in the wake of our ruling, respondents have continued to suffer that exact same First Amendment harm.

True, respondents' international mission sometimes requires that they convey their message through affiliates incorporated in far-off countries, rather than registered here at home. But so what? Audiences everywhere attribute speech based on whom they perceive to be speaking, not on corporate paperwork they will never see. What mattered in *AOSI I* was thus how "clearly identified" the affiliates were with respondents, not the fact that the affiliates were incorporated as separate legal entities. *Ibid.* And what matters now is once again how "clearly identified" the affiliates are with respondents, not the fact that the affiliates were incorporated as *foreign* legal entities.

The First Amendment question therefore hinges, as it did before, on what an objective observer sees, hears, and understands when respondents speak through their foreign affiliates. As to that, not even the Government meaningfully disputes that respondents and their foreign affiliates are clearly identified with one another. Their appearances are the same. Their goals are the same. Their values are the same. *Their message* is the same. Leveraging Congress' spending power to demand speech from respondents' foreign affiliates distorts that shared message—and violates respondents' First Amendment rights. So while respondents and their clearly identified foreign affiliates may be technically different entities with respect to such matters as contracts, taxes, and torts, they are constitutionally the same speaker when it comes to the protected speech at issue in this case.

This two-entities-one-speaker principle is an established part of our First Amendment jurisprudence. Take *Regan.* To refresh, in that case we upheld a ban on engaging in certain protected speech (lobbying) that the federal tax code

imposed on a nonprofit's §501(c)(3) organization because the nonprofit could still speak through a separate §501(c)(4) organization. See 461 U. S., at 544. Put simply, one speaker (the nonprofit) could act (and speak) through two legally separate entities (the §501(c)(3) and §501(c)(4) organizations).

Recall also our similar observation in *League of Women Voters*. There we noted that a funding condition's ban on editorializing would have been constitutional if, in contrast to the law at issue, the statute let noncommercial broadcasters "make known" their "views on matters of public importance" by speaking through legally separate "editorializing affiliate[s]." 468 U. S., at 400. Once again, we made clear that a single speaker can act (and speak) through two legally separate entities. But because the speaker in *League of Women Voters* was not free to do so, we held that the Government's funding condition violated the First Amendment. *Id.*, at 400–401.

*Regan* and *League of Women Voters* are far from our only precedents recognizing this firmly entrenched First Amendment principle. See *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533, 546 (2001) (observing that organizational affiliates may provide "alternative channel[s] for expression" by a single speaker); *Rust* v. *Sullivan*, 500 U. S. 173, 196–198 (1991) (similar). We reiterated that rule once again in *AOSI I.* See 570 U. S., at 215–217, 219.

Thus, in the First Amendment context, the corporate veil is not an iron curtain. Just the opposite. We attribute speech across corporate lines all the time.

Rightly so. When a funding condition restricts speech, this familiar framework often avoids First Amendment problems by allowing "alternative channel[s]" for speakers to express themselves. *Velazquez*, 531 U. S., at 546. And when a funding condition *compels* speech, the same logic leads to a similarly sensible result: The Government may not require you to speak out of both sides of your mouth,

12    AGENCY FOR INT'L DEVELOPMENT *v.* ALLIANCE FOR
OPEN SOCIETY INT'L, INC.

BREYER, J., dissenting

even if each side happens to have been incorporated as a separate legal entity.  See *AOSI I*, 570 U. S., at 219.

A contrary approach would have led to a rather surprising result in *AOSI I*.  Assume for a moment that the Policy Requirement simply commanded respondents' clearly identified affiliates to speak—the kind of "direct regulation of speech" that we said "would plainly violate the First Amendment," *id.*, at 213.  Treating corporate lines as iron-clad would mean that respondents could not object to that direct distortion of their own message.  Under all the cases just discussed, however, that cannot be right.  And as discussed below, it is equally wrong under our cases involving speech misattribution.

B

The First Amendment protects speakers from government compulsion that is likely to cause an audience to mistake someone else's message for the speaker's own views.  See, *e.g.*, *Hurley*, 515 U. S., at 572–573; *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.*, 475 U. S. 1, 15–16 (1986).  Corporate separation makes no meaningful difference in this speech-misattribution context, either.

Consider our unanimous decision in *Hurley*.  In that case, a group called the South Boston Allied War Veterans Council organized a parade.  515 U. S., at 560.  The Irish-American Gay, Lesbian and Bisexual Group of Boston—a separate group who called themselves "GLIB" for short— wanted to participate.  *Id.*, at 561.  After the Veterans Council said no, GLIB obtained a court order directing the Veterans Council to let GLIB march in the parade.  *Id.*, at 561–562.  Recognizing that "every participating unit affects the message conveyed by the parade organizers," we held in *Hurley* that the order distorted the Veterans Council's protected speech.  *Id.*, at 572–573.  Because GLIB wanted to "carr[y] its own banner" with its own message, and because

onlookers would understand GLIB as "contribut[ing] something to" the parade's "common theme," the order "essentially requir[ed]" the Veterans Council "to alter the expressive content of their parade." *Id.*, at 572–573, 576. That violated the First Amendment. *Id.*, at 573.

The First Amendment violation in this case is even more apparent. In *Hurley*, the Veterans Council had merely "combin[ed] multifarious voices" of disparate groups without bothering to "isolate an exact message," yet the First Amendment protected its message from government-compelled distortion all the same. *Id.*, at 569. Respondents in this case have done the Veterans Council one better. They have carefully constructed a cogent message and marshaled their clearly identified foreign affiliates to express it across the globe. See *supra*, at 7–8, 10.

Furthermore, in *Hurley* we could only speculate about what GLIB's exact message was and why the Veterans Council did not want to be associated with it. See 515 U. S., at 574–575. But here we know exactly what the challenged message is ("a policy explicitly opposing prostitution and sex trafficking") and why respondents don't want to be associated with it (the message, among other things, purportedly "'stigmatizes one of the very groups whose trust [respondents] must earn to conduct effective HIV/AIDS prevention'"). 22 U. S. C. §7631(f); Brief for Respondents 11. For that reason as well, the First Amendment injury in this case is open, obvious, and unusually well defined.

True, *Hurley* and our other speech-misattribution cases dealt with a speaker complaining about being forced to affiliate with someone else's speech, rather than (as here) their pre-existing affiliate being forced to speak. Cf. *ante*, at 6. But that factual distinction makes no constitutional difference. From a First Amendment perspective, the latter situation is just as bad or even worse, not better.

Consider *Hurley* again. If, rather than requiring the Veterans Council to let GLIB march while carrying its banner,

14     AGENCY FOR INT'L DEVELOPMENT *v.* ALLIANCE FOR
OPEN SOCIETY INT'L, INC.

BREYER, J., dissenting

the state court had ordered a previously invited marcher (or
worse still, *all* previously invited marchers) to display
GLIB's banner, the Veterans Council would have prevailed
all the same.  By compelling speech from an existing affili-
ate (or all of them), that order would have required, even
more brazenly, that the Veterans Council "alter the expres-
sive content of their parade" in violation of the Veterans
Council's First Amendment rights.  515 U. S., at 572–573.
So too if the state court had decreed that GLIB's banner
must adorn a horse, oxen, or for that matter R2–D2, a
robot—even though those entities lack their own First
Amendment rights.  Whether the transmitter of a speaker's
protected message does (or does not) have its own First
Amendment rights is beside the point.  Cf. *Wooley*, 430
U. S., at 717 (prohibiting New Hampshire from requiring
that the state motto adorn a driver's car, even though cars
do not have First Amendment rights).

There is a reason why, until today, we had not confronted
a case like the one just described.  Cf. *ante*, at 6.  Requiring
someone to host another person's speech is often a perfectly
legitimate thing for the Government to do.  See, *e.g.*, *FAIR*,
547 U. S., at 65 (holding that the Government may require
law schools to host speech from military recruiters); *Prune-*
*Yard Shopping Center* v. *Robins*, 447 U. S. 74, 87–88 (1980)
(holding that the Government may require the owner of a
private shopping mall to host speech from politically
minded pamphleteers).  Even the court order at issue in
*Hurley* was an understandable (though unconstitutional)
application of a "venerable" civil rights law.  See 515 U. S.,
at 571.  But because compelling people to profess a belief
they do not hold is almost always unconstitutional, see
*AOSI I,* 570 U. S., at 213, the Government rarely dares try.
The Government's well-founded reticence in the past is no
reason to bless its boldness at present.

Bottom line: The critical question here, as in *Hurley*, is

simply whether the Government has demanded a profession of belief that will distort the speaker's message. *How* the Government causes that distortion makes no constitutional difference. And as explained, enforcing the Policy Requirement against respondents' clearly identified foreign affiliates would plainly distort *respondents'* message. See *supra*, at 7–8, 10. That violates respondents' First Amendment rights.

## C

So far as I am aware, we have never before held that an American speaker forfeits First Amendment protection when it speaks though foreign affiliates to reach audiences overseas. It is easy to understand why.

Many American news networks operate through clearly identified foreign affiliates when speaking abroad. Viewers attribute that speech to an American speaker: the network. That is the whole point of using *clearly identified* foreign affiliates. For example, CNN speaks to audiences in the Philippines, Brazil, Indonesia, and other countries using foreign affiliates, usually styled as CNN Philippines, CNN Brazil, CNN Indonesia, and so on. See CNN Worldwide Fact Sheet (Oct. 2019), https:// cnnpressroom.blogs.cnn.com/cnn-fact-sheet. But does that corporate structure mean that CNN—*i.e.*, the American parent organization—has no First Amendment protection against a Government effort to, say, prevent CNN Mexico from covering the fatal shooting of a Mexican child by a U. S. Border Patrol agent? Cf. *Hernández* v. *Mesa*, 589 U. S. \_\_\_ (2020) (*Hernández II*). Or to *compel* CNN Mexico to run a different story, perhaps one produced by Government personnel, that praises American policy at the border?

We should be highly skeptical. If the Government commandeered CNN's clearly identified foreign affiliate in these or similar ways, whether by monetary pressure or

some other means, CNN should have constitutional re-
course.  Some critical foreign policy interests might compli-
cate the First Amendment calculus—say, a wartime need
to keep future battle plans secret.  But nothing like that is
present here.  And it is difficult to accept the notion that the
First Amendment permits the Government to suppress,
compel, or otherwise distort any and all American speech
transmitted abroad through a clearly identified foreign af-
filiate.

### III

The upshot is: (1) The messages at issue here belong to
American speakers; (2) clearly identified foreign affiliates
are a critical means of conveying those messages overseas;
and (3) enforcing the Policy Requirement against those af-
filiates distorts respondents' own protected speech—and
thus violates respondents' own First Amendment rights.

The majority justifies its contrary result on three main
grounds, two of which it says are "bedrock principles" of
American law.  See *ante*, at 3–6, 8.  I do not find these ar-
guments persuasive.

### A

The first "bedrock principle" on which the majority relies
is the supposedly long-settled, across-the-board rule "that
foreign citizens outside U. S. territory do not possess rights
under the U. S. Constitution."  *Ante*, at 3.  That sweeping
assertion is neither relevant to this case nor correct on the
law.

It is not relevant because, as I have said, this case does
not concern the constitutional rights of foreign organiza-
tions.  This case concerns the constitutional rights of *Amer-
ican* organizations.  Every respondent here is—and has al-
ways been—American.  *AOSI I*, 570 U. S., at 210; see also
Brief for Petitioners 7, 19 (acknowledging as much).  No for-
eign entities are party to this case, and respondents have

never claimed that the Policy Requirement violates any-one's First Amendment rights apart from their own. Both the District Court and the Court of Appeals decided the case on that basis. The question before us is clear: whether the First Amendment protects *Americans* when they speak through clearly identified foreign affiliates to reach audi-ences overseas. See *supra*, at 8. Whether the foreign affil-iates themselves have their own First Amendment rights is not at issue. See Brief for Respondents 36, n. 3.

Even taken on its own terms, the majority's blanket as-sertion about the extraterritorial reach of our Constitution does not reflect the current state of the law. The idea that foreign citizens abroad *never* have constitutional rights is not a "bedrock" legal principle. At most, one might say that they are unlikely to enjoy very often extraterritorial protec-tion under the Constitution. Or one might say that the mat-ter is undecided. But this Court has studiously avoided es-tablishing an absolute rule that forecloses that protection in all circumstances.

In *Hernández* v. *Mesa*, 582 U. S. \_\_\_ (2017) *(per curiam)* (*Hernández I*), for example, we specifically declined to de-cide the "sensitive" question whether, on the facts then be-fore us, a Mexican citizen standing on Mexican soil had Fourth Amendment rights—precisely because the answer to that extraterritoriality question "may have consequences that are far reaching." *Id.*, at \_\_\_ (slip op., at 5). *Hernández* later came to this Court again, and we decided the case on alternative grounds. See *Hernández II*, 589 U. S., at \_\_\_–\_\_\_ (slip op., at 19–20). Were the majority's categorical rule of (non)extraterritoriality etched in stone, we could have disposed of *Hernández* the first time around in a few short sentences.

Nor do the cases that the majority cites support an abso-lute rule. See *ante*, at 3. The exhaustive review of our prec-edents that we conducted in *Boumediene* v. *Bush*, 553 U. S. 723 (2008), pointed to the opposite conclusion. In

18    AGENCY FOR INT'L DEVELOPMENT *v.* ALLIANCE FOR
OPEN SOCIETY INT'L, INC.

BREYER, J., dissenting

*Boumediene*, we rejected the Government's argument that our decision in *Johnson* v. *Eisentrager*, 339 U. S. 763 (1950), "adopted a formalistic" test "for determining the reach" of constitutional protection to foreign citizens on foreign soil. 553 U. S., at 762.  This is to say, we rejected the position that the majority propounds today.  See *ante*, at 4, and n. (quoting *Eisentrager* at length).  Its "constricted reading" of *Eisentrager* and our other precedents is not the law.  See *Boumediene*, 553 U. S., at 764; see also, *e.g.*, Neuman, Understanding Global Due Process, 23 Geo. Immigration L. J. 365, 400 (2009) (describing our cases as rejecting any absolute view).

   The law, we confirmed in *Boumediene*, is that constitutional "questions of extraterritoriality turn on objective factors and practical concerns" present in a given case, "not formalism" of the sort the majority invokes today.   553 U. S., at 764.  Those considerations include the extent of *de facto* U. S. Government control (if any) over foreign territory.  See *ante*, at 4.  But they also include the nature of the constitutional protection sought, how feasible extending it would be in a given case, and the foreign citizen's status vis-à-vis the United States, among other pertinent circumstances that might arise.  553 U. S., at 766; see also *United States* v. *Verdugo-Urquidez*, 494 U. S. 259, 278 (1990) (Kennedy, J., concurring) (providing the decisive fifth vote for rejecting a foreign citizen's claim to constitutional protection on foreign soil outside U. S. control because "[t]he conditions and considerations of *this case* would make adherence to *the Fourth Amendment's warrant requirement* impracticable and anomalous" (emphasis added)).   Our precedents reject absolutism.  Indeed, even our most sweeping statements about foreign citizens' (lack of ) constitutional rights while outside U. S. Territory have come with limits.  See, *e.g.*, *Landon* v. *Plasencia*, 459 U. S. 21, 32 (1982) (noting that "an alien seeking initial admission to"

this country "has no constitutional rights *regarding his application*" (emphasis added)); *Kleindienst* v. *Mandel*, 408 U. S. 753, 762 (1972) (similar).

There is wisdom in our past restraint. Situations where a foreign citizen outside U. S. Territory might fairly assert constitutional rights are not difficult to imagine. Long-term permanent residents are "foreign citizens." Does the Constitution therefore allow American officials to assault them at will while "outside U. S. territory"? Many international students attend college in the United States. Does the First Amendment permit a public university to revoke their admission based on an unpopular political stance they took on social media while home for the summer? Foreign citizens who have never set foot in the United States, for that matter, often protest when Presidents travel overseas. Does that mean Secret Service agents can, consistent with our Constitution, seriously injure peaceful protestors abroad without any justification?

We have never purported to give a single "bedrock" answer to these or myriad other extraterritoriality questions that might arise in the future. To purport to do so today, in a case where the question is not presented and where the matter is not briefed, is in my view a serious mistake.

And there is no need to set forth an absolute rule here. Respondents have conceded that their foreign affiliates lack First Amendment rights of their own while acting abroad. See *ante*, at 3. If in spite of everything else, the majority considers this point material to its decision, all that need be said is: "We accept respondents' concession and proceed on that basis." To say so much more "run[s] contrary to the fundamental principal of judicial restraint," a principle that applies with particular force to constitutional interpretation. *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. 442, 450 (2008); see also, *e.g.*, *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439,

445 (1988); *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 467 U. S. 138, 158 (1984); *United States* v. *Raines*, 362 U. S. 17, 21 (1960); *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration*, 113 U. S. 33, 39 (1885).

B

The majority's second supposedly "bedrock principle" is that "separately incorporated organizations are separate legal units with distinct legal rights and obligations." *Ante*, at 5.  Sometimes true, sometimes not.  This baseline rule gives way in many contexts, and our First Amendment precedents (including *AOSI I*) refute any suggestion that a workaday principle of corporate law somehow resolves the constitutional issue here in dispute.

As the majority acknowledges, corporate law itself permits courts to pierce or otherwise disregard the corporate veil in a variety of circumstances.  See *ante*, at 5.  Those narrow exceptions, however, are not the only time the law looks past corporate formalities.  For instance, we have treated "several nominally separate business entities" as "a single employer" for purposes of federal labor law.  *Radio & Television Technicians* v. *Broadcast Service of Mobile, Inc.*, 380 U. S. 255, 256 (1965) (*per curiam*).  Earlier this Term, we reaffirmed that one corporate entity may sometimes invoke the right of another, legally separate entity to compel arbitration.  See *GE Energy Power Conversion France SAS* v. *Outokumpu Stainless USA, LLC*, 590 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 4).  And these are far from the only relevant examples.  See, *e.g.*, *American Needle, Inc.* v. *National Football League*, 560 U. S. 183, 196 (2010) (observing that, in many antitrust cases, corporate formalities are "not determinative").

More to the point, our First Amendment precedents leave no doubt that corporate formalities have little to say about the issue now before us.  We have made clear again and

again (and again) that speech may be attributed across corporate lines in the First Amendment context—including in our previous opinion in this very case. See *AOSI I*, 570 U. S., at 219 (concluding that speech uttered involuntarily by legally separate affiliates may be attributed to respondents if the affiliates are "clearly identified" with respondents); *League of Women Voters*, 468 U. S., at 400 (observing that funding conditions that restrict speech can survive constitutional scrutiny if the speaker may "make known its views on matters of public importance through" a legally separate affiliate—and if not, not); *Regan*, 461 U. S., at 544 (similar); *Rust*, 500 U. S., at 196–198 (similar); *Velazquez*, 531 U. S., at 546–547 (similar). And these precedents further establish that merely requiring speakers to work through affiliates is "not unduly burdensome" and can therefore cure, rather than create, First Amendment concerns. *Regan*, 461 U. S., at 545, n. 6. Contra, *ante*, at 8 (suggesting that such a requirement would be unconstitutional). Small wonder the majority can muster only two context-specific and statute-specific cases—one addressing the Foreign Sovereign Immunities Act, the other involving the Racketeer Influence and Corrupt Organizations Act—as affirmative support for its conclusion that corporate formalities somehow control the First Amendment question before us. See *ante*, at 5 (citing *Dole Food Co.* v. *Patrickson*, 538 U. S. 468 (2003), and *Cedric Kushner Promotions*, *Ltd.* v. *King*, 533 U. S. 158 (2001)).

The majority also attempts to distinguish the facts before us now from the facts that were before us last time. It asserts that, in contrast to the affiliations we addressed in *AOSI I*, respondents' "current affiliations with foreign organizations are their own choice." *Ante*, at 8. There are two problems with this. First, the description is not accurate. Foreign governments—and increasingly, the U. S. Government—often require respondents to work through foreign

affiliates. See, *e.g.*, App. 368, 373–375. Second, even if respondents' associations with foreign affiliates *were* voluntary, it would not solve the First Amendment problem.

In *Wooley*, for example, it was the drivers' choice to own a car, but that did not mean they could be compelled to convey the Government's message on their car's license plate. See 430 U. S., at 717. And in *Hurley*, as explained, the Government would have violated the parade organizers' First Amendment rights just the same if it had compelled speech from a previously invited marcher, whether human, animal, or droid. See *supra*, at 13–14. Can the majority really mean to suggest otherwise, simply because the parade organizers' decision to invite the marcher in the first place was "their own choice"?

C

The majority also makes two practical arguments, but neither justifies the First Amendment costs of its decision.

The majority first says that a ruling in respondents' favor would disrupt American foreign policy by requiring the Government to fund "organizations that may not align with U. S. values." *Ante*, at 6. We dismissed this same concern in *AOSI I*. The Policy Requirement, we explained, does not merely help the Government "enlist the assistance of those with whom it already agrees." *AOSI I*, 570 U. S., at 218. It pressures funding recipients "*to adopt* a particular belief." *Ibid.* (emphasis added). All that is at stake here, in other words, is whether the Government may leverage the power of the purse to win converts to its cause. That bare desire to regulate protected speech is far from any foreign policy interest that could conceivably overcome a speaker's First Amendment right to convey its message free from government-compelled distortion. Cf. *New York Times Co.* v. *United States*, 403 U. S. 713 (1971) (*per curiam*).

The majority also fears that determining whether Government action creates a risk of speech misattribution (and

with it speech distortion) is a "legally unmoored" standard rife with "difficult line-drawing exercises." *Ante*, at 8. But we have drawn just this kind of line many times. See, *e.g.*, *PruneYard*, 447 U. S., at 87 (holding that "views expressed by members of the public" in a privately owned shopping mall "will not likely be identified with those of the owner"); *Hurley*, 515 U. S., at 572 (holding that a marcher's message will likely be attributed to the parade organizer's, since "every participating unit" in a parade "affects the [overall] message"); *FAIR*, 547 U. S., at 65 (holding that nothing about having military recruiters on campus "suggests that law schools agree with any speech by recruiters"). I should think that the price of making difficult judgment calls is well worth paying to protect First Amendment rights. See *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. 185, 209 (2014); *Lloyd Corp.* v. *Tanner*, 407 U. S. 551, 570 (1972). And "on the facts presented in this case," at any rate, "the answer is clear." *Id.*, at 570. Enforcing the Policy Requirement violates respondents' First Amendment rights, just as it did before.

\*   \*   \*

The Court today concludes that respondents' foreign affiliates "do not have a First Amendment right to disregard the Policy Requirement." *Ante*, at 9. Respondents have never argued otherwise. Rather, throughout this litigation they have asserted their own First Amendment right to speak their mind, rather than the Government's message. Here, respondents claim First Amendment protection when they speak through foreign affiliates to address audiences abroad. By denying respondents that protection, I fear the Court's decision will seriously impede the countless American speakers who communicate overseas in a similar way. That weakens the marketplace of ideas at a time when the value of that marketplace for Americans, and for others, reaches well beyond our shores. With respect, I dissent.